207 P.3d 289 (2009)
2009 MT 125
350 Mont. 211
In re the Mental Health of C.R.C., Respondent and Appellant.
No. DA 08-0325.
Supreme Court of Montana.
Submitted on Briefs February 19, 2009.
Decided April 14, 2009.
For Appellant: Jim Wheelis, Chief Appellate Defender; Koan Mercer, Assistant Appellate Defender, Helena, Montana.
For Appellee: Hon. Steve Bullock, Montana Attorney General; Matthew T. Cochenour, Assistant Attorney General, Helena, Montana Bernie Cassidy, Lincoln County Attorney, Libby, Montana.
Chief Justice MIKE McGRATH delivered the Opinion of the Court.
¶ 1 C.R.C. appeals from an order of commitment to the Montana State Hospital (MSH) in Warm Springs, including authorization for involuntary administration of medication, from the Nineteenth Judicial District Court, Lincoln County. We affirm.
¶ 2 The only issue on appeal is whether C.R.C. was denied effective assistance of counsel.

BACKGROUND
¶ 3 This is the second time this Court has addressed an appeal by C.R.C. challenging her involuntary commitment to MSH. See In re Mental Health of C.R.C., 2004 MT 389, 325 Mont. 133, 104 P.3d 1065 (vacating a previous commitment order of C.R.C.). C.R.C. suffers from a long-term mental disorder, paranoid schizophrenia, which has *290 brought her into conflict with the law on numerous occasions since 1978, and has resulted in multiple psychiatric hospitalizations. C.R.C. is consumed with delusional thinking that causes her to believe that she is being harassed and victimized by neighbors, law enforcement officers, the judicial system, and hospital staff. Psychiatric evaluations have indicated that C.R.C. suffered from paranoid delusions and reacted with uncontrolled rage when her mental disorder or legal difficulties were raised.
¶ 4 On July 2, 2007, Lincoln County Sheriff's deputies served C.R.C. with a protective order based on her continued verbal harassment and threats to her neighbors. Within minutes of serving the order, the deputies observed C.R.C. screaming profanities at her neighbor, threatening her neighbor's life, and walking towards the neighbor's house. The deputies arrested C.R.C. for violating the protective order and she was charged with two felonies and one misdemeanor.
¶ 5 C.R.C.'s behavior while incarcerated resulted in the District Court ordering her to undergo a psychological evaluation at MSH. The evaluation indicated that C.R.C. suffered from paranoid schizophrenia and could not fully understand the criminal proceedings or assist in her defense. The court dismissed the criminal charges and ordered the State to petition for involuntary commitment. The State's petition alleged that C.R.C. suffered from a mental disorder and requested that she be committed to MSH for three months and receive medication, involuntarily if necessary, to effectively treat C.R.C. or protect her or the public.
¶ 6 The District Court appointed James Reintsma (Reintsma) as C.R.C.'s counsel and Dr. Virginia Hill (Dr. Hill), the MSH staff psychiatrist, as the mental health professional. The District Court attempted to conduct an initial appearance with all parties through video-conferencing on March 31, 2008. However, C.R.C. became distressed and left the room after accusing her attorney of being fraudulent and marketing humans. Unable to determine C.R.C.'s preference for the statutory "friend of the respondent," the court appointed Becky Stovall (Stovall), a case worker at Western Montana Mental Health Center who had previously worked with C.R.C.
¶ 7 The District Court held a second initial appearance on April 3, 2008. Again C.R.C. refused to participate and Reintsma and Stovall, with Dr. Hill's concurrence, waived C.R.C.'s right to be physically present at any hearings in accordance with § 53-21-119, MCA. The court granted Reintsma's motion for an independent psychological evaluation by Dr. Timothy Casey (Dr. Casey). Dr. Casey twice attempted to evaluate C.R.C., however, she refused to meet with him on both occasions, and he was therefore unable to conduct the evaluation.
¶ 8 Dr. Hill submitted a report to the court on April 7, 2008, regarding C.R.C.'s mental disorder requiring commitment. The report indicated that C.R.C. had suffered from paranoid schizophrenia for at least 15 years and had been hospitalized on three previous occasions. The report noted that C.R.C. demonstrated active symptoms of her mental condition, including paranoid delusions and "explosive anger when her views are even slightly challenged." The report suggested that C.R.C. believed her neighbors and children had been stolen, murdered, and replaced with copies. She also believed that a cult was tormenting her by chanting on the hillside behind her home in the predawn hours. C.R.C. repeatedly refused to cooperate during Dr. Hill's interview. She described her attorney and the District Court as "fraudulent criminals" and the friend of the respondent as a "fraudulent witch." She accused Dr. Hill of helping "those criminals" steal her home. Dr. Hill concluded that C.R.C. "views the world as a very sinister place and has shown the capacity to preemptively strike when she feels threatened in any way." Dr. Hill recommended that C.R.C. be committed to MSH for further treatment, including administration of involuntary medication if necessary.
¶ 9 After reviewing Dr. Hill's report, Reintsma and Stovall waived C.R.C.'s right to an adjudication hearing and stipulated that she suffered from a mental disorder and required commitment. Reintsma did not stipulate to C.R.C.'s placement and requested a dispositional hearing. C.R.C. was reminded *291 of the time of the dispositional hearing on several occasions, including the day of the hearing, June 24, 2008. Upon learning who would attend the hearing, C.R.C. stated that "she would absolutely not come to the hearing." At the hearing, Dr. Hill testified that during C.R.C.'s stay at MSH, C.R.C. threatened to kill people and physically assaulted MSH staff when they attempted to administer medication. Dr. Hill also testified that C.R.C. is "at risk of preemptive action" based on the fact that she possessed "two of the three highest risk factors for dangerousness," untreated paranoid schizophrenia symptoms and a history of dangerousness.
¶ 10 The District Court ordered C.R.C. committed to MSH for 90 days and authorized involuntary administration of medication as necessary for treatment of her mental disorder. The court concluded that this order represented "the most appropriate, least restrictive form of treatment available." The District Court based its order on Dr. Hill's report, the proceedings in C.R.C.'s prior criminal case, other evidence from the proceeding, and Reintsma and Stovall's stipulation. The District Court found that, because of her serious mental disorder, C.R.C. is an "imminent threat of injury to herself and to others." The District Court further found:
CRC is consumed with delusional thinking that causes her to believe that she is being harassed and victimized by neighbors, law enforcement officers, the judicial system, and hospital staff. She believes, for example, that her children have been abducted, murdered, and replaced with doubles. The same for her neighbors. CRC believes that there is a chanting cult on the hillside behind her home that torments her in the pre-dawn hours. No amount of psychotherapy has been able to reshape CRC's delusional and paranoid thinking, and, in fact, when efforts are made to discuss these topics, she reacts with rage. Dr. Hill testified that medication is the foundation for any treatment of CRC's condition and that without it there is virtually no hope of effectively treating CRC's mental disorder. CRC adamantly rejects her diagnosis, and she is violently opposed to the use of any medication. Without medication, however, CRC's treatment will amount to nothing more than long-term warehousing, and there is virtually no prospect for her eventual safe return to the community. The involuntary administration of medication is necessary to protect CRC, the staff at MSH, and the public, and is essential to facilitate effective treatment of CRC's condition.
¶ 11 Reintsma notified the court that a notice of appeal had been filed and moved for a stay of execution of the authorization for involuntary administration of medication. The District Court denied the stay on July 7, 2008. By this time C.R.C. had been at MSH for 267 days with no apparent improvement in her mental condition.
¶ 12 C.R.C. now claims that her counsel's waiver of her right to an adjudicatory hearing and stipulation to commitment constitutes ineffective assistance of counsel on appeal.

STANDARD OF REVIEW
¶ 13 This Court exercises plenary review of constitutional issues of due process and the right to counsel. In re Mental Health of K.G.F., 2001 MT 140, ¶ 17, 306 Mont. 1, 29 P.3d 485.

DISCUSSION
¶ 14 Whether C.R.C. was denied effective assistance of counsel.
¶ 15 Involuntary civil commitments in Montana are governed by Title 53, Chapter 21, MCA. Section 53-21-101(4), MCA, expressly provides that one purpose of Montana's laws regarding the treatment of the seriously mentally ill is to "ensure that due process of law is accorded any person coming under the provisions of this part." Section 53-21-115, MCA, outlines particular procedural due process rights afforded to persons involuntarily detained or against whom a commitment petition is filed. Section 53-21-115(5), MCA, provides for the right to be represented by counsel. This Court, citing Article II, Section 17, of the Montana Constitution and Title 53, Chapter 21, has held that the right to counsel provides an individual subject to an involuntary commitment proceeding *292 the right to effective assistance of counsel, which includes the right to challenge a commitment order through a claim of ineffective assistance of counsel. K.G.F., ¶¶ 31, 70, 90.
¶ 16 This Court concluded that the two-part test for ineffective assistance of counsel in criminal defense cases, derived from Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), is inappropriate for involuntary civil commitment proceedings because it failed to adequately protect the liberty interests of the involuntarily committed. K.G.F., ¶ 33. Instead, this Court identified five "critical areas" to better measure effective assistance of counsel in involuntary commitment proceedings: 1) appointment of competent counsel; 2) counsel's initial investigation; 3) counsel's interview with the client; 4) the patient-respondent's right to remain silent; and 5) counsel's role as an advocate for the patient-respondent. K.G.F., ¶¶ 70-86. "[U]pon a substantial showing of evidence ... that counsel did not effectively represent the patient-respondent's interests pursuant to the foregoing standards, an order of involuntary commitment should be vacated." K.G.F., ¶ 91.
¶ 17 This Court then discussed some presumptions to apply to involuntary commitments. "The foregoing guidelines create the presumption that a client wishes to not be involuntarily committed." K.G.F., ¶ 87. "Thus, we conclude that pursuant to the foregoing guidelines, evidence that counsel independently advocated or otherwise acquiesced to an involuntary commitmentin the absence of any evidence of a voluntary and knowing consent by the patient-respondent will establish the presumption that counsel was ineffective." K.G.F., ¶ 88.
¶ 18 Based on K.G.F., C.R.C. challenges her counsel's advocacy on her behalf. Drawing on the National Center for State Courts' Guidelines for Involuntary Civil Commitment, the Court discussed how the proper role of an attorney in involuntary commitment proceedings is to "represent the perspective of the respondent and to serve as a vigorous advocate for the respondent's wishes." K.G.F., ¶ 86 (citation omitted). "To the extent that a client is unable or unwilling to express personal wishes, the attorney should advocate the position that best safeguards and advances the client's interest." K.G.F., ¶ 86 (citation omitted).
¶ 19 As an initial matter, we note that it is unclear whether a challenge based only on one of the five "critical areas" discussed in K.G.F. would meet the threshold "substantial showing of evidence ... that counsel did not effectively represent the patient-respondent's interests." K.G.F., ¶ 91. Therefore, we hold that our review should consider the record as a whole, and each of the factors needs to be evaluated based on the facts and circumstances of the entire case. Nothing in the record or the briefs suggests a deficiency in the first four "critical areas" identified by the Court in K.G.F. While C.R.C. only challenges counsel's role as an advocate for the patient-respondent, this case raises important questions about how to apply the presumptions described in K.G.F., thereby warranting a more thorough discussion.
¶ 20 The question of effective assistance of counsel is complicated by the dichotomy between counsel's directive to "advocate the position that best safeguards and advances the client's interest" and the presumption of ineffective assistance when "counsel independently advocated or otherwise acquiesced to an involuntary commitment" without the patient-respondent's consent. K.G.F., ¶¶ 86, 88. Clearly, and K.G.F. does not hold otherwise, this presumption can be rebutted by facts and circumstances that arise in a particular case.
¶ 21 Montana law specifically provides for a waiver of rights of the mentally ill during commitment proceedings:
(1) A person may waive his rights, or if the person is not capable of making an intentional and knowing decision, these rights may be waived by his counsel and friend of respondent acting together if a record is made of the reasons for the waiver. The right to counsel may not be waived. The right to treatment provided for in this part may not be waived.
(2) The right of the respondent to be physically present at a hearing may also be waived by his attorney and the friend of *293 respondent with the concurrence of the professional person and the judge upon a finding supported by facts that:
(a) the presence of the respondent at the hearing would be likely to seriously adversely affect his mental condition; and
(b) an alternative location for the hearing in surroundings familiar to the respondent would not prevent such adverse effects on his mental condition.
Section 53-21-119, (1), (2), MCA.
¶ 22 The record here indicates that the statutory guidelines for a waiver of C.R.C.'s rights were followed. Dr. Hill testified that physical restraint would have been absolutely essential for C.R.C. to physically attend her hearings and that such restraint would be harmful to C.R.C. This conclusion supported counsel's waiver of C.R.C.'s physical appearance in the commitment proceedings. Counsel's waiver of C.R.C.'s right to an adjudicatory hearing regarding the need for commitment was specifically based on Dr. Hill's report to the court, which detailed her mental condition and the imminent danger she posed.
¶ 23 Notwithstanding C.R.C.'s lack of involvement in her case, the record reveals many facts to rebut the presumption that her counsel was ineffective. Reintsma moved for an independent psychological evaluation of C.R.C. by Dr. Casey under § 53-21-118, MCA. This independent evaluation could have challenged the State's evidence regarding the need to involuntarily commit and medicate C.R.C. Dr. Casey attempted on two separate occasions to perform the evaluation, but was rebuffed by C.R.C. Reintsma reserved the ability to request future substitutions of the friend of the respondent. Reintsma cross-examined Dr. Hill regarding her conclusions that C.R.C. posed an imminent threat of danger to herself or others and the proposed course of treatment involving involuntary medication. Finally, Reintsma informed the District Court that he planned to appeal the court's order allowing administration of involuntary medication, and moved to stay execution of the order. These efforts, despite C.R.C.'s consistent refusal to participate in her own defense, demonstrate that Reintsma provided effective assistance of counsel throughout C.R.C.'s commitment proceedings.
¶ 24 When a client refuses to cooperate in her own defense, how far must counsel go to advocate for a position established only by presumption? There is nothing in K.G.F. to accord the presumption of ineffective assistance of counsel conclusive weight. This case provides an example where the presumption of ineffective assistance of counsel is rebutted by the facts presented. C.R.C. refused to meet with her counsel, refused to make any court appearances, and refused to meet with a doctor for an independent psychological evaluation requested by counsel on her behalf. What should counsel have done to effectively assist her? C.R.C. claims that he should not have stipulated to her commitment. But that stipulation was in accord with the law and in the face of overwhelming evidence that, as a result of mental illness, C.R.C. was a danger to herself and others. Moreover, her unwavering refusal to participate in any stage of the proceedings seriously undermined counsel's efforts to advocate on her behalf. We hold that these facts can rebut the presumption of ineffective assistance of counsel as provided in K.G.F. To do otherwise would create a precedent requiring counsel to oppose all efforts designed to address his client's mental health needs regardless of circumstances.
¶ 25 Without question C.R.C. needs help. She is a diagnosed paranoid schizophrenic with two of the three highest risk factors for dangerousness. She has a history of threatening others, uncontrollable anger, and abusive profanity. Her neighbors feared for their safety and avoided leaving their homes when C.R.C. was outside. One of the officers who responded to incidents leading to C.R.C.'s arrest concluded in his report:
Based on my training and experience I believe [C.R.C.] is a threat to her neighbors. Our Office has taken multiple reports from several different neighbors who have had to change their own lives because of [C.R.C.]. At this time not even law enforcement presence or summons to court will change [C.R.C.'s] behavior.
Dr. Hill concluded in her report:
Without hospital structure and supervision (including the provision of all basic needs), *294 [C.R.C.] is considered to be an imminent danger to others. Persons with untreated Paranoid Schizophrenia have a higher incidence of violence toward others compared with the general population. [C.R.C.] has a strong family history of Schizophrenia, including Schizophrenia associated with violence. Patient's criminal history, ongoing conflicts with neighbors, and recent behaviors in the hospital milieu speak to the rage that [C.R.C.] is capable of when a situation does not comport with her expectations.
The District Court concluded:
CRC's total lack of insight into her condition and her violent resistence [sic] to other forms of therapy make the administration of medication imperative if any progress is to be made in treating her mental disorder. Without treatment, CRC will simply be warehoused until her eventual release, and she will return to the community as an irrational and dangerous person who would be a high risk to harm herself or others before the involuntary commitment cycle inevitably repeats itself. CRC and those who will come into contact with hermany of whom will be unaware of her condition and therefore unable to take preemptive efforts to protect themselvesdeserve better than that. Medication is not a punishment; it is the lynchpin of CRC's treatment.
Thus, the record demonstrates that C.R.C. posed a danger to herself and others requiring commitment. See § 53-21-126, MCA. Her own acts within the hospital and pursuing her neighbors, even in the presence of law enforcement officers, demonstrate a proclivity to place herself in danger. "We must recognize, after all, that an involuntary commitment is supposed to help, not punish, the person who `may be suffering from a mental disorder.'" K.G.F., ¶ 63 (referencing § 53-21-101, MCA, and Addington v. Texas, 441 U.S. 418, 428, 99 S.Ct. 1804, 1810, 60 L.Ed.2d 323 (1979)).
¶ 26 C.R.C. refuses to believe she has a mental illness, refuses to participate in any legal proceedings, and clearly does not want to be committed to MSH. It is presumptuous indeed to assume that effective assistance is limited to sending her home to suffer a mental illness without help. The most effective assistance possible here was to provide the court and hospital authorities with arguments for appropriate treatment of her mental illness.
¶ 27 This case provides an example where counsel attempted to work with his client to advocate on her behalf, but the client refused to participate in her own defense at every stage of the proceedings. Even without her input, counsel continued to advocate on her behalf. Counsel followed the law when he waived C.R.C.'s right to an adjudicatory hearing as permitted by statute, and worked to advance the best interests of his client, despite her persistent lack of cooperation. We hold that the presumption of ineffective assistance, when counsel acquiesced to the involuntary commitment of the patient-respondent without her consent, is rebutted by these facts. We decline to find that counsel's actions in this case were ineffective.
¶ 28 Affirmed.
We concur: JEFF SHERLOCK, Hon. JEFF SHERLOCK, District Court Judge sitting for Justice BRIAN MORRIS.
We concur: JOHN WARNER, PATRICIA COTTER, W. WILLIAM LEAPHART and JIM RICE, JJ.
Justice JOHN WARNER concurs.
¶ 29 I concur with the Court's opinion. I note that this case provides a clear example of why there should be no presumption that counsel for a person that is alleged to be seriously mentally ill is ineffective simply because he or she does not resist commitment. This presumption, established in K.G.F. at ¶ 88, should be discarded in favor of a determination based on the record whether counsel for a respondent was actually ineffective.
Justice JAMES C. NELSON dissents.
¶ 30 Respectfully, I dissent from the Court's decision.
¶ 31 There is nothing in In re Mental Health of K.G.F., 2001 MT 140, 306 Mont. 1, 29 P.3d 485, that states that the presumption set out in ¶ 88 of that Opinion is rebuttable. Opinion, ¶ 24. Rather, K.G.F. unequivocally *295 states that "the absence of any evidence of a voluntary and knowing consent [to commitment] by the patient-respondentwill establish the presumption that counsel was ineffective." K.G.F., ¶ 88.
¶ 32 Here, as the Court concedes, C.R.C. did not voluntarily and knowingly consent to her commitment. Indeed, as the Opinion clearly shows, she fought being committed and treated with every ounce of her being. Opinion, ¶¶ 6-8. C.R.C. was very forceful in voicing her desires and in refusing to cooperate with the State's efforts to involuntarily commit her. Importantly, she had that right! There is nothing in the blackletter law or the United States or Montana Constitutions that required C.R.C. to roll over and play dead or to grease the skids of the process that was bent on taking her liberty and her dignity from herregardless of the sterling motives this Court attributes to the result of that process.[1] Opinion, ¶ 27.
¶ 33 Defense counsel did not have to waive C.R.C.'s right to resist her commitment. C.R.C. lived in her neighborhood for many years. While she was sometimes offensive, obscene and threatening, the same can be said of many neighbors in many neighborhoods across this State. The point is, C.R.C. never hurt anyone. Defense counsel could have simply put the State to its proof and offered what he could in the way of cross-examination and argument in support of his client's desire not to be involuntarily committed. Defense counsel effectively turned an involuntary commitment proceeding into a voluntary oneagainst the wishes of his client.
¶ 34 We would condemn a criminal defense attorney who stands before the fact-finder and concedes the guilt of the accused against his or her client's wishes. So should we here, where the person to be committed suffers no less loss of liberty and dignity; where she is no less stigmatized; and where she is charged, not with a crime, but rather, with the unfortunate circumstance of her illness. Defense counsel had the statutory and constitutional obligation to advocate for what little chance at liberty and dignity C.R.C. had left; he should not have simply given those important constitutional rights away.
¶ 35 This Court's Opinion in K.G.F. forced some simple, beneficial, albeit unwelcome, reforms on Montana's system of involuntary civil commitments. Defense counsel are now required to come to court with at least some minimal training; to actually consult with their clients; to prepare before they reach the steps of the courthouse; to fight to preserve their client's statutory rights under Title 53, chapter 21, MCA, and their constitutional rights under Article II, Sections 4 and 17 of the Montana Constitution; and to vigorously advocate for their clients' wishes. K.G.F., ¶¶ 66-89. None of these has been popular with prosecutors or the trial bench. Not surprisingly, there are many in both groups who argue for a return to the expedient, pro-forma, paternalistic approach of the past. After all, it was quicker, cheaper and more convenient when attorneys appointed to defend persons subject to involuntary commitment simply conceded defeat at the outset.
¶ 36 Unfortunately, with this decision, the polestar of our review of ineffective assistance of counsel claims in involuntary civil commitment cases changes. No longer will we enforce the bright line presumption of K.G.F. Henceforth, the focus will be on justifying what defense counsel did or, more likely, did not do, in the defense of his or her client. Sadly, history and experience teach us that the courts will always be able to find a rationale supporting the result sought to be achievedinvoluntary commitment.
¶ 37 Montanans whose only affront is their sickness deserve better from their courts and from their government.
¶ 38 Respectfully, I dissent.
NOTES
[1] Indeed, this process basically involves little more than taking the mentally ill person off the streets for a short period of time; medicating her; counseling her a few times; declaring that she is stable and no longer a threat; and then putting her back out on the streetsoften to repeat the cycle all over again. And, when this spit-wad approach to treating mental illness inevitably misses the mark, we warehouse the products of our systemic failures in Deer Lodge, Warm Springs or Boulder. Mission accomplished!