

DA 10-0297

## IN THE SUPREME COURT OF THE STATE OF MONTANA

### 2011 MT 28

IN THE MATTER OF THE MENTAL HEALTH OF:

T.J.F.,

       Respondent and Appellant.

APPEAL FROM:    District Court of the Eighth Judicial District,
In and For the County of Cascade, Cause No. CDI 10-022
Honorable Kenneth R. Neill, Presiding Judge

COUNSEL OF RECORD:

    For Appellant:

        Joslyn Hunt, Chief Appellate Defender; Eileen A. Larkin, Assistant Appellate
Defender, Helena, Montana

    For Appellee:

        Steve Bullock, Montana Attorney General; Jonathan M. Krauss, Assistant
Attorney General, Helena, Montana

        John Parker, Cascade County Attorney; Steve Bolstad, Deputy County
Attorney, Great Falls, Montana

Submitted on Briefs:  January 5, 2011

Decided:  February 23, 2011

Filed:

_____
Clerk

Justice Michael E Wheat delivered the Opinion of the Court.

¶1     The Eighth Judicial District Court, Cascade County, entered Findings of Fact, Conclusions of Law, and an Order finding T.J.F. suffered from a mental disorder and was an imminent threat to himself or others because of his mental disorder. T.J.F. was committed to the Montana State Hospital for a period not to exceed 90 days. T.J.F. appeals. We affirm.

¶2     T.J.F. was living with his grandparents in their home when his grandfather began to notice changes in T.J.F.'s behavior. His grandfather testified that T.J.F. was not himself and he felt something was going on with T.J.F. His grandfather testified that T.J.F. was aggressive, anxious, lacked comprehension, refused to follow house rules, and had "no control and just loses himself." T.J.F. also destroyed or threatened to destroy his grandfather's property. His grandfather felt T.J.F. needed medical help, such as going to the Montana State Hospital.

¶3     On April 2, 2010, T.J.F.'s father and his father's girlfriend visited T.J.F. in the hopes of getting T.J.F. mental health treatment. T.J.F.'s grandfather testified that T.J.F. "tried to run out of there and cussing and swearing and just losing it actually." T.J.F.'s father tried to hold him down, and his father's girlfriend called the police.

¶4     When the police arrived, T.J.F. ran down the street. Police officers followed him, trying to engage T.J.F. While running, T.J.F. yelled obscenities and said repeatedly "I'm just out for a run. You've got nothing on me." T.J.F. also jumped in front of cars, causing them to slam on their brakes and stop. T.J.F. yelled obscenities at the drivers and told them he was being harassed. T.J.F. also punched a patrol car, putting "a pretty good dent in the front

fender." When the officers finally caught up to T.J.F., he started "kicking, fighting, attempting to bite officers that were holding him." It took all officers present (approximately seven) to detain T.J.F.

¶5     After being detained, T.J.F. was taken to the emergency room for a psychological evaluation. At the hospital, T.J.F. was medicated and calmed down enough for the officers to take restraints off him. The hospital would not accept T.J.F. as a patient because he was "too great of a safety risk," so he was transported to the county jail. It appears from the record that T.J.F. was released without further proceedings.

¶6     Several weeks later, on April 29, 2010, T.J.F. was pulled over for failing to stop at a stop sign. T.J.F. got out of his vehicle and began to walk away. The officer asked him to stop. T.J.F. responded with an obscenity and came back to speak with the officer. T.J.F. was acting aggressively and was "extremely upset." The officer called for backup. T.J.F. was "unpredictable" and was "in an enraged state." The officer asked T.J.F. to sit in his vehicle and he complied. Several more officers arrived and T.J.F. locked himself in his vehicle. Officer Houston spoke with T.J.F. and asked him to step out of his vehicle. T.J.F. complied. The officers attempted to put T.J.F. in handcuffs to control the situation for officer safety. T.J.F. resisted, asking "Why?" and using profanity. T.J.F. would not turn around to be cuffed and "it went immediately to a fight." The officers were unable to control T.J.F. and T.J.F. was tased several times. T.J.F. stopped resisting and was taken into custody.

¶7     On May 7, 2010, the Cascade County Attorney's Office filed a petition seeking a mental evaluation of T.J.F., that T.J.F. be appointed counsel, and that T.J.F. be committed to

3

the Montana State Hospital pending resolution of the petition. The District Court set an initial appearance for May 11, 2010, and ordered T.J.F. held at the Montana State Hospital until that time. At the initial appearance, T.J.F. appeared, via Vision Net from the Montana State Hospital, with his appointed counsel. The District Court ordered T.J.F. to submit to a mental evaluation and that T.J.F. be detained at the Montana State Hospital pending further proceedings.

¶8     A bench trial was held on May 17, 2010.[1] T.J.F. appeared in person, represented by counsel. Prior to trial, when T.J.F. was not present in the courtroom, the chief security officer "indicated some concerns about the safety of court personnel" due to T.J.F. "acting out both verbally and physically." The District Court conducted a security hearing and took sworn testimony in order to determine "how and whether or not – to what extent [T.J.F.] should be restrained during these proceedings." The security officer testified that T.J.F. was a threat to the safety of court personnel and the people involved in the hearing. T.J.F.'s counsel asked the District Court to give T.J.F. the opportunity to show he could behave before being restrained, or in the alternative, the least restrictive restraints, such as handcuffs. The State asked that T.J.F. be restrained by "belly chains and additional restraints." The security officer recommended "[a]t the minimum, [a] belly chain and hand restraints . . . I would also prefer leg irons due to the fact that he has been kicking and he did demonstrate the behavior today while he was in transport." Ultimately, the District Court found T.J.F. was a "danger to court personnel," including his own counsel, and ordered full restraints. In

4

doing so, the District Court found "this is a bench trial; there won't be the prejudice that would be presented in front of a jury."

¶9     The District Court also discussed two other matters on the record before T.J.F. was brought into the courtroom.  First, it confirmed with T.J.F.'s counsel that T.J.F. waived a jury trial.  Second, the District Court confirmed that T.J.F.'s counsel received an order regarding examination by another professional, and checked on the status of that examination.  T.J.F. was then brought into the courtroom and was present in person, in full restraints, for the rest of the proceedings.

¶10     At the bench trial, Mr. Delbert Fischer, a licensed clinical professional counselor and mental health professional, testified regarding his evaluation of T.J.F.  He found T.J.F. was "suffering a psychosis to a degree that it perhaps is aggravated by [his] history of substance abuse, and as a consequence of his substance abuse it's somewhat difficult to pin down the diagnosis."  Mr. Fischer diagnosed T.J.F. with a psychotic disorder (not otherwise specified), and wanted to rule out substance abuse.  Mr. Fischer testified that substance abuse might mask a mental illness, but also that mental illness may be aggravated by substance abuse. He testified that T.J.F.'s behavior "puts himself and others within the community at risk for harm.  And as a result, I thought that hospitalization would be appropriate."  Ultimately, Mr. Fischer testified that, to a reasonable degree of medical certainty, T.J.F. suffered from a mental disorder.  Finally, he testified that the least restrictive placement for T.J.F. was at the Montana State Hospital.

---

[1] T.J.F. waived his right to a jury trial.

5

¶11 The District Court issued Findings of Fact, Conclusions of Law, and an Order committing T.J.F. to the Montana State Hospital for a period not to exceed 90 days. The District Court found "to a reasonable degree of medical certainty, [T.J.F.] suffers from a mental disorder" and "[b]ecause of the mental disorder, there is an imminent threat of injury to [T.J.F.] and others through overt acts and failures to act. The least restrictive placement for [T.J.F.] . . . is commitment to the Montana State Hospital."

¶12 T.J.F. raises three issues on appeal, restated as follows:

¶13 *Issue One: Did the District Court violate T.J.F.'s due process and statutory rights when it held a security hearing without T.J.F. present and when it required him to appear at his bench trial in restraints?*

¶14 *Issue Two: Was T.J.F.'s trial counsel ineffective for failing to object to holding the security hearing without T.J.F. present?*

¶15 *Issue Three: Did the District Court err in concluding the State proved T.J.F. met the statutory criteria for commitment?*

## STANDARD OF REVIEW

¶16 We exercise plenary review of constitutional questions, such as due process and the right to counsel. *In re Mental Health of C.R.C.*, 2009 MT 125, ¶ 13, 350 Mont. 211, 207 P.3d 289 (hereinafter *C.R.C. II*); *In re Mental Health of L.K.*, 2008 MT 169, ¶ 17, 343 Mont. 366, 184 P.3d 353.

¶17 We review the findings of a district court sitting without a jury to determine if the court's findings were clearly erroneous. *In re Mental Health of A.S.B.*, 2008 MT 82, ¶ 17,

6

342 Mont. 169, 180 P.3d 625. A district court's findings are clearly erroneous if substantial credible evidence does not support them, the district court misapprehended the effect of the evidence, or if a review of the record leaves this Court with the definite and firm conviction that a mistake has been made. *Id*.; *In re Mental Health of C.R.C.*, 2004 MT 389, ¶ 11, 325 Mont. 133, 104 P.3d 1065 (hereinafter *C.R.C. I*). The evidence is viewed in the light most favorable to the prevailing party when determining whether substantial evidence supports the district court's findings. *Id*. The district court's conclusions of law are reviewed to determine whether those conclusions are correct. *A.S.B.*, ¶ 17.

## DISCUSSSION

¶18    As an initial matter, we note that T.J.F.'s appeal from an expired 90-day commitment is not moot. *In re Mental Health of D.V.*, 2007 MT 351, ¶ 32, 340 Mont. 319, 174 P.3d 503.

¶19    *Issue One: Did the District Court violate T.J.F.'s due process and statutory rights when it held a security hearing without T.J.F. present and when it required him to appear at his bench trial in restraints?*

¶20    T.J.F. argues the District Court violated both his due process right and statutory right to be present during any hearing or trial, and his due process right to be free from bodily restraint. The State argues that T.J.F.'s counsel did not object to either the security hearing or to T.J.F. being in restraints during the bench trial. Further, the State argues that T.J.F. has not sought plain error review of these issues.

### A. The Security Hearing

¶21 T.J.F.'s counsel did not object to the security hearing. To preserve an objection for appeal, a party must state grounds for the objection that are sufficiently specific. *In re B.I. & N.G.*, 2009 MT 350, ¶ 16, 353 Mont. 183, 218 P.3d 1235 (*citing State v. Benson*, 1999 MT 324, ¶ 19, 297 Mont. 321, 992 P.2d 831.). Because T.J.F.'s trial counsel did not object to holding the security hearing without T.J.F. present, T.J.F. did not properly preserve this issue for appeal.

¶22 However, we note that any person involuntarily detained or against whom a petition for involuntary commitment has been filed has the right to be present at any hearing or trial. Sections 53-21-115(2), -116, MCA; *In re Mental Health of L.K.*, 2009 MT 366, ¶ 12, 353 Mont. 246, 219 P.3d 1263. T.J.F. was not present for the security hearing held by the District Court and he argues this violates his right to be present at any hearing. At the security hearing, nothing about the underlying petition was decided. The security hearing was simply an administrative proceeding held to ensure the orderly conduct of the hearing on the State's petition. *See* § 3-1-111(3), MCA (every court has the power to provide for the orderly conduct of proceedings before it). The District Court made no ruling whatsoever on the State's petition, but ruled only on the issue of restraints. Once that issue was decided T.J.F. was promptly brought into the courtroom and was present for the entire commitment hearing.

**B. Restraints During the Bench Trial**

¶23 T.J.F. next argues that requiring him to appear in full restraints during his bench trial violated his due process right to be free from bodily restraint and his right to dignity under

the Montana Constitution. The State argues that T.J.F. did not object, and therefore his present argument was waived.

¶24 T.J.F.'s counsel did object to T.J.F. appearing in full restraints, despite not using the word "objection." T.J.F.'s counsel made "a statement on the record," saying:

> Judge, just before the beginning of the trial I did briefly meet with [T.J.F.] and he indicated to me that he was calm, that he had the ability to remain calm throughout the trial. He understood that he needs to be on his best behavior here in the courtroom. I would ask, Your Honor, that the Court would give him an opportunity to show that he can behave before he is restrained. Alternatively, if the Court feels that it is necessary to impose some restraint, that the least restrictive restraint be imposed, probably maybe handcuffing him, and the Court give him an opportunity to see if he can behave, and if for any reason that he seems to not be able to maintain composure here in the courtroom, then at that point it isn't an issue of whether additional restraint is necessary.

The argument on appeal was not waived by failure to object.

¶25 The District Court ultimately found:

> The Court feels that the respondent [T.J.F.] is a danger to court personnel, including respondent's counsel. The Court agrees that this is a bench trial; there won't be the prejudice that would be presented in front of a jury. And accordingly, I'm going to order full restraints, including leg irons, handcuffs and belly chains for the respondent for the purposes of these proceedings.

T.J.F. was then brought in and was fully restrained throughout his commitment hearing.

¶26 The due process clauses of the United States and Montana Constitutions entitle *criminal* defendants to appear before *juries* free of bodily restraints. U.S. Const. amends. V and XIV; Mont. Const. art. II, Section 17; *State v. Merrill*, 2008 MT 143, ¶ 12, 343 Mont. 130, 183 P.3d 56 (emphasis added). The reason for this, of course, is to avoid creating the impression within the minds of jurors that a criminal defendant is guilty or dangerous, thus

9

possibly prejudicing the defendant and his right to a fair trial. The right to be free from physical restraints is not absolute however. *Merrill*, ¶ 12. The district court must be persuaded by compelling circumstances that some measure is needed to maintain the security of the courtroom, and must pursue less restrictive alternatives before imposing physical restraints. *State v. Herrick*, 2004 MT 323, ¶ 14, 324 Mont. 76, 101 P.3d 755 (adopting this test from the Ninth Circuit Court of Appeals); *Merrill*, ¶ 13. The district court's decision to restrain a criminal defendant during trial is reviewed for an abuse of discretion. *Merrill*, ¶ 10.

¶27 It appears that Montana has not yet addressed whether an individual facing civil commitment has such a right. The statutes governing involuntary commitment offer no guidance on this particular issue. *See* §§ 53-21-101 to -198, MCA. Rather, the statues provide a list of procedural rights regarding those facing involuntary commitment. Section 53-21-115, MCA. The right to appear without restraints is not among them. *Id*.

¶28 Although not authoritative, we find the criminal cases above informative on this issue, and were this case about an individual appearing in full restraints before a jury in a civil commitment proceeding we may be inclined to adopt the standard adopted in *Herrick*. However, that is not the case. Involuntary commitment proceedings are civil in nature. There need not be automatic congruence between procedural due process requirements in criminal trials and involuntary civil commitments. *Tyars v. Finner*, 709 F.2d 1274, 1283 (9th Cir. 1983). Although we do not adopt the *Herrick* standard for this particular case, we find that in an involuntary commitment proceeding before a district court sitting without a jury,

there must be a showing on the record that restraints are needed before the District Court may order them.

¶29 Applying this standard, we find no error by the District Court in requiring T.J.F. to appear before it, at a bench trial, in full restraints. The record shows the District Court took testimony on the issue, and allowed both the State and T.J.F.'s counsel to address it. Contrary to T.J.F.'s assertions, T.J.F. was not restrained solely due to T.J.F.'s verbal outbursts, but also due to him acting out physically during the ride from the Montana State Hospital to court that day, and the allegations of T.J.F.'s violent behavior in the underlying petition. The District Court established, on the record, the need for restraints to maintain the security of the courtroom and court personnel, which was well within its authority. Section 3-1-111(3), MCA (every court has the power to provide for the orderly conduct of proceedings before it). Further, the District Court made the specific finding that, because there was no jury, the potential for T.J.F. to be prejudiced by appearing in restraints was obviated.

¶30 Finally, and importantly, the record is devoid of any prejudice suffered by T.J.F. because he appeared in restraints. T.J.F.'s argument to the contrary – that "[t]he district court prejudged T.J.F. as requiring involuntary commitment based on a 'feeling' that T.J.F. was dangerous" - is unsupported by the record and without merit. We also find no violation of T.J.F.'s right to dignity under the Montana Constitution. The District Court established a need for T.J.F. to be restrained, and we find no error.

11

¶31    *Issue Two: Was T.J.F.'s trial counsel ineffective for failing to object to holding the security hearing without T.J.F. present?*

¶32    T.J.F. argues his trial counsel was ineffective for failing to object when the District Court held a security hearing outside of his presence. The State argues that the record as a whole establishes that T.J.F.'s counsel was effective.

¶33    The proper role of an attorney in involuntary commitment proceedings is to represent the perspective of the respondent and to serve as a vigorous advocate for the respondent's wishes. *C.R.C. II*, ¶ 18. The traditional *Strickland* test for ineffective assistance does not apply to involuntary commitment proceedings. *Id*. at ¶ 16. We look instead to five "critical areas" to measure effective assistance of counsel in involuntary commitment proceedings: 1) appointment of counsel; 2) counsel's initial investigation; 3) counsel's interview with the client; 4) the patient-respondent's right to remain silent; and 5) counsel's role as an advocate for the patient-respondent. *Id*. Upon a substantial showing of evidence that counsel did not effectively represent the patient-respondent's interests pursuant to these five critical areas, an order of involuntary commitment should be vacated. *Id*. We review the record as a whole, and each critical factor is evaluated based upon the facts and circumstances of the entire case. *Id*. at ¶ 19.

¶34    The only factor implicated here is counsel's role as an advocate for the patient-respondent. Based upon the record as a whole, and the facts and circumstances of the entire case, we cannot say that T.J.F.'s counsel was ineffective. While she did not object to the security hearing being held without T.J.F. present, she did advocate for him during the

12

security hearing, asking the District Court to allow him an opportunity to conform his behavior before restraining him and asking for the least restrictive restraints. The record is replete with other evidence of counsel's vigorous advocacy – she moved for T.J.F.'s release pending trial, actively objected during witness testimony, cross-examined all witnesses, succeeded in having hearsay evidence excluded, and advocated for the dismissal of the petition. In all, T.J.F.'s counsel represented the perspective of T.J.F. and served as a vigorous advocate for T.J.F.'s wishes. We find no reversible error.

¶35 *Issue Three: Did the District Court err in concluding the State proved T.J.F. met the statutory criteria for commitment?*

¶36 T.J.F. argues the District Court erred by failing to consider T.J.F.'s substance abuse and by finding T.J.F. an imminent danger to himself or others because of his mental disorder. The State argues that while T.J.F. admitted substance use, there was no evidence substance abuse played a role in this case, and that the District Court made the requisite connection between the mental disorder and T.J.F.'s conduct.

¶37 At trial on a petition for involuntary commitment, the district court must first "consider all the facts relevant to the issues of whether the respondent is suffering from a mental disorder." Section 53-21-126(1), MCA. If the district court determines that the respondent is suffering from a mental disorder, it must "then determine whether the respondent requires commitment." *Id*. In determining whether the respondent requires commitment and the appropriate disposition under § 53-21-127, MCA, the court shall consider the following:

13

(a) whether the respondent, because of a mental disorder, is substantially unable to provide for the respondent's own basic needs of food, clothing, shelter, health, or safety;

(b) whether the respondent has recently, because of a mental disorder and through an act or an omission, caused self-injury or injury to others;

(c) whether, because of a mental disorder, there is an imminent threat of injury to the respondent or to others because of the respondent's acts or omissions; and

(d) whether the respondent's mental disorder, as demonstrated by the respondent's recent acts or omissions, will, if untreated, predictably result in deterioration of the respondent's mental condition to the point at which the respondent will become a danger to self or to others or will be unable to provide for the respondent's own basic needs of food, clothing, shelter, health, or safety. Predictability may be established by the respondent's relevant medical history.

*Id*. Satisfaction of any one of the criteria listed above justifies commitment. Section 53-21-127(7), MCA. The term "mental disorder" does not include addiction to drugs or alcohol. Section 53-21-102(9)(b), MCA. A mental disorder may co-occur with an addiction or chemical dependency. Section 53-21-102(9)(c), MCA.

¶38 The District Court found "there is little, if any, evidence of substance abuse much less dependency or addiction." We agree. While there is evidence that T.J.F. used drugs occasionally, there is no evidence in the record that T.J.F. was addicted to drugs, or that T.J.F. was even using drugs at the time the events underlying the petition occurred. Mr. Fischer testified that T.J.F.'s "medical illness" caused him to exhibit behaviors that put him and others in the community at risk of harm. T.J.F.'s argument that his behavior was caused by substance abuse is not supported by the record. We find no error in the District Court's findings on this issue.

14

¶39 The District Court also found that "[b]ecause of the mental disorder, there is an imminent threat of injury to [T.J.F.] and others through overt acts and failures." T.J.F. argues that there is no evidence that T.J.F. caused injury or posed the imminent threat of injury to anyone because of his mental disorder. However, the record demonstrates that T.J.F., while fleeing from police, ran in and out of traffic, causing drivers to slam on their brakes. T.J.F. punched a patrol car. T.J.F. was agitated, enraged, and unpredictable. Mr. Fischer's report indicates that T.J.F.'s behavior was bizarre and aggressive. Mr. Fischer testified that, to a reasonable degree of medical certainty, T.J.F. had a mental disorder and because of this T.J.F. posed a risk of harm to himself and the community. Based on the record before the Court, we find no error in the District Court's findings on this issue.

## CONCLUSION

¶40 For the reasons stated above, we affirm.

/S/ MICHAEL E WHEAT

We Concur:

/S/ MIKE McGRATH
/S/ BRIAN MORRIS
/S/ JIM RICE

Justice James C. Nelson specially concurs.

15

¶41 I concur with the Court's Opinion as to Issues 2 and 3 and the result of the Opinion. I specially concur with the result of Issue 1 on the facts of this case only.

¶42 Specifically, I am not necessarily persuaded that just calling the security hearing an "administrative proceeding," Opinion, ¶ 22—assuming, arguendo, that is what it is—relieves the trial court from honoring the person's statutory rights under § 53-21-115(2), MCA. Constitutional issues aside, this statute plainly and unambiguously guarantees the right of the person against whom a petition is filed to be present at "any hearing." The statute does not except out or exempt "administrative proceedings" or, for that matter, any other hearing however the Court wants to denominate the proceeding. Our precedent requires that this Court "rigorously adhere to the standards" expressed and the statutory rights accorded to persons subject to involuntary civil commitment. *In re Mental Health of K.G.F.*, 2001 MT 140, ¶ 92, 306 Mont. 1, 29 P.3d 485. The Court has not followed that precedent here by creating, from whole cloth, an "administrative proceeding" exemption from § 53-21-115(2), MCA.

¶43 That said, I conclude that the error is harmless on the facts of this case. Given that the involuntary commitment proceeding was tried to the court, as opposed to a jury, I am not persuaded that T.J.F. was prejudiced by the court's error.

¶44 Additionally, if the person subject to an involuntary commitment proceeding is to be restrained in a court proceeding, I would adopt the same test that we adopted in *State v. Herrick*, 2004 MT 323, ¶¶ 14-15, 324 Mont. 76, 101 P.3d 755, and re-affirmed in *State v. Merrill*, 2008 MT 143, ¶¶ 18-20, 343 Mont. 130, 183 P.3d 56. The Court's standard,

16

Opinion, ¶ 28 (where the court is sitting without a jury, "there must be a showing on the record that restraints are needed before the [court] may order them"), gives courts—especially when prodded by law enforcement—virtually unlimited discretion to order the person shackled or physically restrained. In my view, a person who are subject to an involuntary commitment proceedings has—and loses—virtually the same liberty and dignity interests that a criminal defendant has and loses as a result of a criminal proceeding. I would not, therefore, adopt a lesser standard for shackling or restraining a person subject to involuntary civil commitment than that required in a criminal proceeding.

¶45 Again, however, on the facts of this case, I am persuaded that the trial court's error was harmless.

¶46 Accordingly, I specially concur with the result reached in Issue 1, but not in all that is said.

/S/ JAMES C. NELSON