FILED

February 10 2015

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 14-0041

DA 14-0041

IN THE SUPREME COURT OF THE STATE OF MONTANA

2015 MT 40

IN THE MATTER OF:

B.O.T.,

　　　　　Respondent and Appellant.

APPEAL FROM:　　　District Court of the Fourth Judicial District,
In and For the County of Missoula, Cause No. DI 13-115
Honorable Robert L. Deschamps, III, Presiding Judge

COUNSEL OF RECORD:

　　　　　For Appellant:

　　　　　Kathryn McEnery, McEnery Law Office, PLLC, Kalispell, Montana

　　　　　For Appellee:

　　　　　Timothy C. Fox, Montana Attorney General, Jonathan M. Krauss, Assistant Attorney General, Helena, Montana

　　　　　Kirsten H. Pabst, Missoula County Attorney, Erica Grinde, Deputy County Attorney, Missoula, Montana

Submitted on Briefs:　December 10, 2014
Decided:　February 10, 2015

Filed:

_____
Clerk

Justice Laurie McKinnon delivered the Opinion of the Court.

¶1 Appellant B.O.T. appeals from the order and judgment of the Fourth Judicial District Court, Missoula County, committing him to Montana State Hospital for 90 days. We affirm.

¶2 B.O.T. presents the following issue for review:

*Whether there was substantial evidence to conclude that B.O.T., because of a mental disorder, was unable to provide for his own basic needs of food, clothing, shelter, health or safety.*

## FACTUAL AND PROCEDURAL BACKGROUND

¶3 On December 24, 2013, the State filed a petition for commitment alleging that on the night of December 23, 2013, B.O.T. was taken by ambulance to the emergency room of Community Medical Center in Missoula. B.O.T. had apparently been lying on the ground at a Missoula bus station. The District Court later observed that the night was cold, and that it was "sleeting and raining and extraordinarily miserable." B.O.T. was admitted to Community Medical Center overnight for observation and treatment. Further diagnosis revealed that B.O.T. suffered from several chronic health conditions: diabetes, hypertension, and hyperkalemia.[1]

¶4 The petition further alleged that hospital staff reported B.O.T. was very uncooperative and pulled out his IV in order to get some candy. After the IV was put back in place, B.O.T. broke it into two pieces. Due to B.O.T.'s irrational behavior and his refusal to take medications as directed, B.O.T. was referred for a mental health

---

[1] Hyperkalemia refers to abnormally high potassium concentration in the blood. *Dorland's Illustrated Medical Dictionary* 795 (28th ed. 1994).

evaluation to be conducted by J. David Washburn, a licensed clinical social worker. Mr. Washburn found B.O.T. difficult to evaluate because B.O.T.'s thinking was extremely disorganized, his mumbled speech was difficult to understand, and B.O.T. did not provide much useful information. Mr. Washburn deduced that B.O.T. was a client at Winds of Change Mental Health Center, and upon further inquiry, Washburn learned that B.O.T.'s condition had been deteriorating because of B.O.T.'s refusal to cooperate with the administration of medication by staff at that facility. In addition, Mr. Washburn learned that B.O.T. was given a food stamp card to purchase food, but was either unwilling or unable follow through with getting a PIN to activate the card. B.O.T. was also reportedly "having delusions about receiving large sums of money deposited into his account from his sister in Louisiana . . . ."

¶5 On December 26, 2013, the District Court held an initial appearance on the State's petition and advised B.O.T. of his rights pursuant to § 53-21-115, MCA. B.O.T. was appointed counsel, professional persons were appointed to examine B.O.T., and a case manager from Western Montana Mental Health Center was appointed as friend to protect B.O.T.'s interests. A commitment hearing was scheduled for December 27, 2013. Pending the hearing, the District Court ordered that B.O.T. be detained at Montana State Hospital (MSH) pursuant to § 53-21-124, MCA.

¶6 During the commitment hearing on December 27, 2013, the State presented the testimony of Thomas Hodgetts, a licensed clinical social worker and certified mental health professional with Western Montana Mental Health Center. Hodgetts had evaluated B.O.T. around noon the day of the hearing. Prior to the evaluation and

3

commitment hearing, Hodgetts reviewed the evaluation conducted by Washburn, the records of MSH, and consulted with Rosie Jennings, a treatment provider at Winds of Change. Hodgetts explained that B.O.T. had been residing at several group homes operated by Winds of Change, but was no longer able to do so because of inappropriate sexual behavior and refusal to take medication. He was not able to stay at the Poverello Center for the same reasons. Additionally, Hodgetts related that B.O.T. had some misdemeanor charges involving inappropriate sexual behavior, which resulted in a three-week stay in the Missoula Detention Center. Hodgetts indicated B.O.T. was released about ten days prior to the State's filing of the petition, and had been residing at area motels. However, B.O.T. had been evicted from the Colonial Motel and feared he would be arrested for nonpayment of room charges.

¶7 Hodgetts surmised that Winds of Change was the designated protective payee for B.O.T.'s Supplemental Security Income (SSI) funds. Finally, Hodgetts described that, based upon available information, B.O.T. "absolutely did not want to create a PIN number in order to access his [food stamp] card. He was noncompliant with his case manager's suggestions on how to do that. He would not cooperate with the case manager in obtaining a PIN number."

¶8 Hodgetts concluded that B.O.T. was "unable—not allowed to go to the Poverello Center, which puts him at risk of homelessness in the middle of winter. That certainly would be harmful." Further, Hodgetts noted B.O.T. was not able to access his food stamp card. Hodgetts explained that "even though B.O.T. may have the [financial]

4

resource, he does not seem able to utilize the resource that's available to get food. So he does not have access to safe shelter and safe food at this time."

¶9 Hodgetts also testified that, based upon a reasonable degree of medical certainty, B.O.T. suffers from schizoaffective disorder and it was Hodgetts's opinion, based upon the foregoing information, that B.O.T. is unable to meet basic needs of food and shelter. Hodgetts opined that the least restrictive environment for treatment of B.O.T. was MSH. Finally, because B.O.T. had been uncooperative in receiving his injectable antipsychotic medication, Hodgetts believed an involuntary medication order was necessary.

¶10 B.O.T. testified that his plan, if he were permitted to leave the hearing, was to go to the bus station, go to the Winds of Change "compound" to get "the balance of $700 due me," and then go to Wal-Mart to buy some tape to finish boxing up his things. After boxing up his things, he would travel "westward, to El Monte, California," where his brother has a medical practice "that is in need of a research associate." When counsel inquired about what he would do for food, B.O.T. explained that he would get his last month's check from Winds of Change, go charge his debit card, and "go to the Savmor food store and buy a pastrami sandwich." He would then buy his bus ticket for El Monte and leave at "11 o'clock tonight." If he did not have enough money for a bus ticket he anticipated he would go back to the Missoula Detention Center. B.O.T. also clarified that his diagnosis is schizo type and not schizoaffective or schizophrenic, and that he takes 1.1 milligrams of Risperdal for his mental disorder and metformin for his diabetes. Although B.O.T. was able to articulate coherent answers to some questions with reasonable specificity, his answers overall can only be characterized as disjointed and disorganized.

5

¶11 The District Court made the following observation at the conclusion of the hearing:

> Well, this is a tough case because there's a lot of people that are odd out there, and we can't lock them all in Warm Springs. There's a lot of people that have trouble with day-to-day living, and we can't lock them all up.
>
> On the other hand, [B.O.T.'s] thinking is plainly disorganized. By his own admission, he's got some kind of schizo-related disease. And it's pretty apparent that he was at risk on at least the night of the 23rd because he ended up at the emergency room for some kind of medical condition.
>
> And it does appear that he's got an issue with housing. I'm not even sure that the Colonial, based on his testimony, is available to him. His plan to go to California is all hinged on getting money from . . . Winds of Change, I guess which . . . I'm not sure that's possible, although I don't know.
>
> And I think he is a danger to himself in his current condition; not because he's going to do self-harm, as the witness said, but because he's going to either engage in some kind of conduct that gets him back in jail or in the hospital.

¶12 In its written order, the District Court concluded that "[B.O.T.] was unable to provide the Court with a clear plan to care for his basic needs." B.O.T. "admitted to having a serious mental illness" and is "unable to demonstrate how he would care for himself to protect himself from harm if released from inpatient treatment." The District Court ordered B.O.T. committed to MSH for 90 days and that medication could be involuntarily administered.

**STANDARD OF REVIEW**

¶13 We review a district court's order of commitment to determine whether the court's findings are clearly erroneous and its conclusions of law are correct. *In re Mental Health of L.K.-S.*, 2011 MT, ¶ 14, 359 Mont. 191, 247 P.3d 1100. A finding of fact is clearly erroneous if it is not supported by substantial evidence or if, after review of the entire

record, we are left with the definite and firm conviction that a mistake has been made. *L.K.-S.*, ¶ 14. When determining whether substantial evidence supports the district court's findings, this Court views the evidence in the light most favorable to the prevailing party. *In re Mental Health of T.J.F.*, 2011 MT 28, ¶ 17, 359 Mont. 213, 248 P.3d 804.

## DISCUSSION

¶14 *Whether there was substantial evidence to conclude that B.O.T., because of a mental disorder, was unable to provide for his own basic needs of food, clothing, shelter, health or safety.*

¶15 At the trial on a petition for commitment, the court must first determine whether the respondent suffers from a mental disorder, defined as "any organic, mental, or emotional impairment that has substantial adverse effects on an individual's cognitive or volitional functions." Section 53-21-102(9)(a), MCA. Upon finding that a person suffers from a mental disorder, the court must then determine whether the respondent requires commitment by considering several criteria set forth in § 53-21-126(1), MCA, including "whether the respondent, because of a mental disorder, is substantially unable to provide for the respondent's own basic needs of food, clothing, shelter, health, or safety." All physical facts and evidence must be proven beyond a reasonable doubt, and all other matters must be proven by clear and convincing evidence. Section 53-21-126(2), MCA. Mental disorders must be proven to a reasonable degree of medical certainty. Section 53-21-126(2), MCA. If the court is satisfied that any one of the criteria listed in § 53-21-126(1), MCA, is met, then commitment may be ordered. Section 53-21-127(7), MCA.

7

¶16 The District Court found, and the parties do not dispute, that B.O.T. suffers from a mental disorder as defined in § 53-21-102(9)(a), MCA. Although the District Court did not specifically state which provision of § 53-21-126(1), MCA, it was relying upon, the District Court concluded that "[b]ased on his mental state and recent behaviors, Respondent is unable to meet his basic needs, which puts Respondent at risk of imminent self harm." We construe this as a determination made pursuant to § 53-21-126(1)(a), MCA, and accordingly review whether substantial evidence supports the finding that B.O.T., "because of a mental disorder, is substantially unable to provide for [his] own basic needs of food, clothing, shelter, health, or safety."

¶17 The professional person may testify as to the ultimate issue of whether the respondent is suffering from a mental disorder and requires commitment, but this testimony is insufficient if there is no evidence that the respondent, because of a mental disorder, is substantially unable to take care of the respondent's own basic needs. Section 53-21-126(4)(a), MCA. We again observe, however, that it is "not necessary to present evidence of overt acts to prove that respondent suffers from a mental disorder that renders him substantially unable to provide for his basic needs." *In re R.F.*, 2013 MT 59, ¶ 26, 369 Mont. 236, 296 P.3d 1189 (citing *In re G.P.*, 246 Mont. 195, 198, 806 P.2d 3, 6 (1990)). Evidence of overt acts or omissions is only necessary where the commitment is based upon the imminent threat of self-inflicted injury or injury to others. Section 53-21-126(2), MCA; *R.F.*, ¶ 26.

¶18 The State's only witness was its professional person, Thomas Hodgetts. Hodgetts testified that it was his opinion that B.O.T. could not meet his basic needs of food,

8

clothing, and shelter as a result of B.O.T.'s serious mental disorder. Hodgetts based his opinion upon information obtained in records, from consultation with other treatment providers, and from consultation with B.O.T. himself. No objection was made to Hodgetts's testimony regarding the information he relied upon in making his conclusion. The evidence established that B.O.T. had a history of serious mental illness requiring injectable antipsychotic medication, that he was homeless, and that he was unable to obtain food because he refused to activate his food stamp card. B.O.T.'s own testimony established that he had a serious mental disorder, that he had no housing or shelter, and that he had no immediate ability to obtain food—relying instead upon an inactivated food stamp card and a wire of money from a sister in Louisiana. As the District Court observed, B.O.T.'s thinking was "plainly disorganized" and B.O.T.'s inability to care for his own basic needs "puts [B.O.T.] at risk of imminent self harm."

¶19 B.O.T. argues that because a person may temporarily be between housing placements does not mean a person cannot take care of his basic needs. B.O.T. also argues that no evidence was submitted that B.O.T. was malnourished or hungry and that evidence was presented by B.O.T. that he was compliant in taking his medication. Finally, B.O.T. argues that a significant portion of the State's evidence was hearsay.

¶20 The question here is whether there was substantial evidence admitted without objection at the commitment hearing which supported the court's findings. *T.J.F.*, ¶ 17. The evidence presented without objection showed that B.O.T. had recently presented to the emergency room because of a lapse in care of his chronic medical conditions, as well as uncertainty regarding his living conditions and his disorganized thought. B.O.T. had

9

no immediate ability to obtain food and no cognizable plan for housing or shelter. B.O.T.'s serious mental disorder requires administration through injection of antipsychotic medication. B.O.T. also suffers from diabetes which requires medication, and he had elevated potassium levels upon admission to the emergency room. B.O.T.'s own testimony confirmed many of these findings.

¶21 The Court's role is not to determine whether there was sufficient evidence to enable the lower court to reach a different conclusion, but simply to determine whether the conclusion that it did reach is supported by substantial evidence. *Schmidt v. Cook*, 2005 MT 53, ¶ 31, 326 Mont. 202, 108 P.3d 511. Based upon our review of the record, there is substantial evidence demonstrating that B.O.T. was unable to provide for his own basic needs of food, clothing, shelter, health, or safety. The findings made by the District Court were not clearly erroneous.

¶22 Finally, we address B.O.T.'s contention that a significant amount of the State's evidence relied upon inadmissible hearsay. B.O.T. did not object to the State's evidence, nor does B.O.T. request that we invoke the doctrine of plain error in order to review the alleged error. While we held in *In re Mental Health of J.D.L.*, 2008 MT 445, ¶ 9, 348 Mont. 1, 199 P.3d 805, that the Court will exercise plain error review in an involuntary commitment proceeding to consider unpreserved error "because [the respondent's] substantial right—liberty—is at stake and our failure to review the District Court's alleged error would compromise the judicial process," ordinarily, we still require the assertion of plain error to be raised and argued on appeal. B.O.T. has not asserted plain error review or developed an argument that the alleged error violated a substantial

10

right. We therefore reject B.O.T.'s claims that hearsay evidence was improperly admitted, which were raised for the first time on appeal and without an assertion or argument that plain error review is warranted.

## CONCLUSION

¶23 In conclusion, we note the District Court's apt observation "that this is a tough case because . . . [t]here's a lot of people that have trouble with day-to-day living, and we can't lock all of them up." We emphasize that neither having a mental disorder nor being homeless or hungry are reasons in themselves to involuntarily commit a person. However, the finding that a mental disorder results in a person being homeless or hungry is sufficient to satisfy the criteria of § 53-21-126(1)(a), MCA, and invoke the provisions of § 53-21-127(7), MCA, authorizing involuntary commitment. We observe that in many instances these are difficult findings for the trial court to make, and we are therefore vigilant regarding our standard of review and the province of the trial court to weigh the evidence and judge the credibility of the witnesses. We thus conclude that the judgment and order of the District Court finding that B.O.T. suffered from a mental disorder which prevented B.O.T. from taking care of his own basic needs is supported by substantial evidence and the findings of the District Court are not clearly erroneous. The judgment and order involuntarily committing B.O.T. is affirmed.

/S/ LAURIE McKINNON

We Concur:
/S/ MICHAEL E WHEAT
/S/ PATRICIA COTTER

/S/ BETH BAKER
/S/ JAMES JEREMIAH SHEA