FILED

03/31/2020

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 18-0390

DA 18-0390

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2020 MT 71

IN THE MATTER OF THE
MENTAL HEALTH OF:

W.K.,

      Respondent and Appellant.

APPEAL FROM:    District Court of the Second Judicial District,
In and For the County of Butte-Silver Bow, Cause No. DI-18-25
Honorable Kurt Krueger, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

          Chad Wright, Appellate Defender, Kristen L. Peterson, Assistant Appellate
Defender, Helena, Montana

      For Appellee:

          Timothy C. Fox, Montana Attorney General, Damon Martin, Assistant
Attorney General, Helena, Montana

          Eileen Joyce, Silver Bow County Attorney, Michael Clague, Deputy
County Attorney, Butte, Montana

                        Submitted on Briefs:  February 12, 2020

                                 Decided:  March 31, 2020

Filed:

                   _____
                             Clerk

Justice Beth Baker delivered the Opinion of the Court.

¶1     Appellant W.K. appeals the Order of the Second Judicial District Court involuntarily committing her to the Montana State Hospital ("MSH" or "state mental hospital") for a period not to exceed ninety days. Reviewing the evidence in the light most favorable to the State, we conclude that the District Court had sufficient evidence to support its finding that W.K. was substantially unable to provide for her own basic needs, and we affirm its order of involuntary commitment.

## FACTUAL AND PROCEDURAL BACKGROUND

¶2     At the time of her involuntary commitment, W.K. was a successful business owner in her late fifties. She was married and had a home and supportive family. In early May 2018, W.K. was experiencing sleep deprivation and other changes in behavior. As a result, she made multiple visits to the emergency room to obtain medical attention. Doctors diagnosed W.K. with insomnia and prescribed her sleep medication and a "sleep hygiene protocol." W.K. reported losing twenty pounds, but she otherwise was healthy. She had no history of violence or self-harm. She also reported that she had elected to stop driving due to her insomnia.

¶3     On May 9, 2018, W.K.'s family took her back to the emergency room because of her insomnia and "high energy behaviors." Licensed clinical social worker ("LCSW") Mike Sawicki examined W.K. and concluded that she was experiencing a manic episode. He diagnosed W.K. as suffering from Insomnia Disorder, Persistent type, and Bipolar I Disorder.

2

¶4 Sawicki filed a report with the County Attorney's Office, recommending that it petition the District Court for W.K.'s involuntary commitment. The State filed its petition on May 10. The District Court held an initial hearing that same day at which the court appointed a public defender to represent W.K. The court set an evidentiary hearing for the following day and ordered that W.K. be detained overnight at Hays-Morris House, a residential mental health treatment facility in Butte.

¶5 The morning of the commitment hearing, Lynelli Ankelman, a licensed clinical professional counselor, then the clinical director of the Western Montana Mental Health Center in Butte, conducted an in-person mental health evaluation of W.K. She completed a report detailing her observations. The report contained form language asking whether W.K., because of a mental disorder, was substantially unable to provide for her own basic needs of food, clothing, shelter, health, or safety. Ankelman checked the box marked "Unknown."

¶6 Ankelman was the first to testify at the hearing. Based on her observations, her review of W.K.'s medical records, and her discussion with Sawicki, Ankelman opined that W.K. "is experiencing a manic episode with symptomatology associated with bipolar disorder." Ankelman described that she had observed W.K. exhibit "pressured speech; tangential thinking; poor judgment; poor insight; some paranoia; inability to consent to taking medication[.]" When asked on direct examination to elaborate, Ankelman testified:

> A lot of the paranoia is associated with medication. [W.K.] spent a lot of time researching with the help of the staff that were with her different medications that were offered and what the side [e]ffects were. And she

3

focused pretty significantly on the side effects versus the positive benefits of those medications, to the point that . . . she's unwilling to take any medication that will help her solve the manic symptom because of the side effects that they could potentially have. She did take Vistaril . . . to help with agitation. And it also helps with sleep.

Ankelman testified that the sleep medication did not appear to have any positive effect.

¶7     The State continued its examination, engaging Ankelman in the following colloquy:

Q. Given [W.K.'s] current state, do you think she can meet her basic needs and care for herself?

A. I don't think that there is enough information at this point in time to indicate that. It seemed really clear to me that she is a very . . . accomplished person in the community. She has a business. She has a family that cares for her. But at this point in time she did describe a weight loss of 20 pounds, which could indicate that she's not eating appropriate nourishment. There's just not enough information to indicate that at this point.

Q. What about her decision-making ability?

A. I think that is the crux of the discussion here.

Q. So if she is caring for herself, could she make good decisions for caring for herself?

A. I would say at this point in her current state that she cannot. One of the things that she shared this morning is that she . . . has been to the emergency room, it appears, four different times in the last week to week and a half seeking help for the current symptoms she's experiencing. And at one of those sessions she came out with the understanding that her potassium and salt was out of whack. And she reported drinking an exorbitant number of Pedialytes in order to stabilize that, which then made her sick. I think those are the type of poor judgments that are really at play at this point in time.

¶8     On cross-examination, W.K.'s attorney questioned Ankelman further about W.K.'s ability to provide for her own basic needs.

Q. Have there been any instances in the record where she has been a danger to herself? You mentioned the Pedialyte. That was with her family after being in the emergency room?

4

A. I think that the fact that she's come to the emergency room on four different occasions that she and her family are seeing considerable—that she's unhappy, and they are trying to effect a change for her and just haven't been able to do that at this point with any level of care that's been provided.

.   .   .

Q. As far as you are aware, there have been no issues of her caring for her own basic needs; is that correct? She's healthy. She says she has lost weight, but there are no issues there?

A. None that were brought to my knowledge overtly.

¶9    Ankelman explained that W.K.'s poor insight and judgment placed her at a higher safety risk and that her symptoms did not result simply from sleep deprivation. She concluded that, "for me the bottom line becomes, is she able to remain safe in the community. And the answer is no for me." She recommended that W.K. be involuntarily committed to MSH and involuntarily medicated.

¶10    W.K. testified on her own behalf, confirming that she had a sleep disorder and an intolerance to anti-psychotic drugs. She further testified that she believed she could take care of her own basic needs. Finally, W.K.'s appointed friend, Mr. Wing, told the court that there was no risk of harm and that W.K. could provide for her own basic needs.

¶11    At the conclusion of the hearing, the District Court orally issued its findings that W.K. suffers from a serious mental illness requiring commitment. Based on Ankelman's testimony, the Court found that W.K.'s visits to the emergency room and her conduct demonstrated "that she is a danger to herself and possibly others and that there is a question as to whether or not she is unable to provide for her own basic needs and protect her own life and health." The court further found that MSH was the least restrictive placement.

5

¶12   The court issued a very brief written order the day of the hearing.  It issued its Findings of Fact and Conclusions of Law a week later.  The court clarified its finding that "in her current condition, the Respondent does represent a danger to herself and that she is unable to care for her own basic needs. The Respondent is not a danger to others; however, the Court is concerned that if left untreated the Respondent's condition could predictably deteriorate and consequently be harmful to herself."  It concluded that commitment to MSH was the least restrictive alternative necessary to protect W.K. and to effectively treat her mental disorder.

## STANDARDS OF REVIEW

¶13   In an involuntary commitment proceeding, the State must prove physical facts or evidence beyond a reasonable doubt and "all other matters" by clear and convincing evidence.  Section 53-21-126(2), MCA.  "The district court, as the fact finder, evaluates if the [State] has met its burden of presenting clear and convincing evidence regarding all required elements for [the commitment]. . . .  Upon appeal, . . . this Court does not substitute its judgment as to the strength of the evidence for that of the district court."  *In re B.J.J.*, 2019 MT 129, ¶ 10, 396 Mont. 108, 443 P.3d 488.  We instead review a district court's commitment order to determine whether its findings of fact are clearly erroneous and its conclusions of law are correct.  *In re S.H.*, 2016 MT 137, ¶ 8, 383 Mont. 497, 374 P.3d 693.

¶14   A finding of fact is clearly erroneous if it is not supported by substantial evidence, if the district court misapprehended the effect of the evidence, or if, after reviewing the record, we are left with the definite and firm conviction that a mistake has been made.  *In re S.H.*, ¶ 8.  "In reviewing the sufficiency of the evidence in a civil commitment

6

case . . . we view the evidence in a light most favorable to the prevailing party." *In re C.R.C.*, 2004 MT 389, ¶ 11, 325 Mont. 133, 104 P.3d 1065.

¶15    An appeal from an order of involuntary commitment is not moot despite the respondent's release because the issues are capable of repetition and yet otherwise would evade review. *In re S.H.*, ¶ 9.

## DISCUSSION

¶16    *Did the District Court err in committing W.K. to the state mental hospital?*

¶17    Before a district court may involuntarily commit a respondent, it must first determine that he or she (1) suffers from a mental disorder and (2) requires commitment. Section 53-32-126(1), MCA. The parties do not dispute that W.K. suffers from a mental disorder. They disagree, however, about whether sufficient facts support the District Court's finding that W.K. required commitment to MSH.

¶18    In determining whether the respondent requires involuntary commitment, the court must consider the following:

(a) whether the respondent, because of a mental disorder, is substantially unable to provide for the respondent's own basic needs of food, clothing, shelter, health, or safety;

(b) whether the respondent has recently, because of a mental disorder and through an act or an omission, caused self-injury or injury to others;

(c) whether, because of a mental disorder, there is an imminent threat of injury to the respondent or to others because of the respondent's acts or omissions; and

(d) whether the respondent's mental disorder, as demonstrated by the respondent's recent acts or omissions, will, if untreated, predictably result in deterioration of the respondent's mental condition to the point at which the respondent will become a danger to self or to others or will be

7

unable to provide for the respondent's own basic needs of food, clothing, shelter, health, or safety. Predictability may be established by the respondent's relevant medical history.

Section 53-21-126(1), MCA. The District Court found that W.K. required commitment because she was substantially unable to provide for her own basic needs under § 53-21-126(1)(a), MCA, and that, though not a danger to others, she predictably could deteriorate and cause herself harm if left untreated under § 53-21-126(1)(d), MCA.[1] W.K. challenges the District Court's finding that she required involuntary commitment under § 53-21-126(1)(a), MCA. The State responds that Ankelman's testimony, coupled with W.K.'s conduct, sustains the District Court's determination.

¶19 Section 53-21-126(1)(a), MCA, in conjunction with § 53-21-127(7), MCA, authorizes a district court to involuntarily commit an individual to the state mental hospital if she is unable to substantially provide for her own basic needs of food, clothing, shelter, health, or safety. "Satisfaction of any one of the criteria listed in 53-21-126(1) justifies commitment pursuant to this chapter. However, if the court relies solely upon the criterion provided in 53-21-126(1)(d), the court may require commitment only to a community facility . . . and may not require commitment at the state hospital."

---

[1] The District Court did not directly cite § 53-21-126(1)(a) or (d), MCA, in either its May 11 or May 21 order, and it mentioned that W.K. posed an "imminent threat" to herself, which references subsection (c). But the parties agree—and our review of the record confirms—that the court did not commit W.K. under subsection (c). We therefore construe the court's findings under (a) and (d). Additionally, we base our decision on the aggregate of the District Court's oral findings, its May 11 written order, and its belated May 21 Findings of Fact, Conclusions of Law, and Order. *See In re M.P.-L.*, 2015 MT 338, ¶¶ 14, 22, 381 Mont. 496, 362 P.3d 627.

8

Section 53-21-127(7), MCA. We accordingly examine whether the evidence justified the District Court's decision to commit W.K. to MSH under subsection (1)(a).

¶20 We recently affirmed a district court's decision to commit an individual under § 53-21-126(1)(a), MCA, in *In re S.H.*, ¶ 22. S.H. sought help from the Billings Clinic emergency department; she complained that she was suffering from food poisoning, that there were snakes in her stomach and black bugs in the toilet, and that the voices of God and Satan were arguing in her head. *In re S.H.*, ¶ 3. A psychiatrist evaluated S.H. and, upon his recommendation, the State filed a petition to involuntarily commit her. *In re S.H.*, ¶ 3. A second mental health professional who had evaluated S.H. testified to S.H.'s bipolar disorder and recent episodes; she noted that S.H. lived in a van, had maintained her own hygiene, and was not malnourished. *In re S.H.*, ¶ 5. She explained, however, that S.H. was not welcome at local shelters and had decided to continue living in her van even though the weather had recently turned very cold. *In re S.H.*, ¶ 5. The professional person further testified that S.H. had refused to take medication because she believed God had healed her. *In re S.H.*, ¶ 5. We affirmed the district court's decision to commit S.H. under § 53-21-126(1)(a), MCA, holding that her refusal to obtain treatment and her lack of winter shelter sufficiently demonstrated that she was substantially unable to care for her basic needs. *In re S.H.*, ¶ 13.

¶21 In *In re B.O.T.*, 2015 MT 40, 378 Mont. 198, 342 P.3d 981, we held that sufficient evidence supported the district court's finding that B.O.T. was unable to care for his own basic needs. *In re B.O.T.*, ¶ 21. B.O.T. was taken to Community Medical Center after being found lying on the ground at a bus station in cold weather. *In re B.O.T.*, ¶ 3. At the

9

commitment hearing, a LCSW who evaluated B.O.T. testified that B.O.T. suffered from schizoaffective disorder; was not welcome at shelters or group homes because of inappropriate sexual behavior and was therefore homeless; did not have access to food; and was not caring for chronic medical conditions, including diabetes, hypertension, and hyperkalemia. *In re B.O.T.*, ¶¶ 6-10. B.O.T. did not have a viable discharge plan in place; he testified that, if released, he would travel to California to work at his brother's medical practice as a research assistant. *In re B.O.T.*, ¶ 10. Based on this evidence, the district court found that B.O.T. was substantially unable to provide for his own food, clothing, health, shelter, and safety. We affirmed, citing among other things the lapse of care of his chronic medical conditions, uncertainty regarding his living conditions, inability to obtain food, and lack of plan for housing or shelter. *In re B.O.T.*, ¶ 20.

¶22 We reached a similar result in *In re Mental Health of O.R.B.*, 2008 MT 301, 345 Mont. 516, 191 P.3d 482. There, the district court involuntarily committed O.R.B. to MSH under § 53-21-126(1)(a), MCA, based in part on testimony that because of her schizophrenia, O.R.B. was malnourished, had decaying teeth, and was not taking proper care of her fractured ankle. *In re O.R.B.*, ¶¶ 7-12. One witness testified that O.R.B. was living in "the worst house I have ever been to." *In re O.R.B.*, ¶ 10. There was garbage covering the floor, and no heat in the house in winter. *In re O.R.B.*, ¶ 10. We affirmed, holding that the court's findings were supported by the record. *In re O.R.B.*, ¶ 25.

¶23 The State contends that W.K.'s inability to provide for her basic needs is evidenced by her poor decisions—namely, that her response to insomnia was to seek emergency room treatment four times in one week and to treat herself by drinking an excessive amount of

Pedialytes, yet refuse to accept medication needed to treat her mental disorder. W.K. points out that refusal to take medication, without more, may not serve as the basis for an order of involuntary commitment. *See, e.g., In re S.H.*, ¶ 13. And "poor judgment is a not uncommon human condition" that does not justify commitment. *In re C.R.C.*, ¶ 33.

¶24 "The Court's role is not to determine whether there was sufficient evidence to enable the lower court to reach a different conclusion, but simply to determine whether the conclusion that it did reach is supported by substantial evidence." *In re B.O.T.*, ¶ 21 (citation omitted). Substantial evidence is relevant evidence that a reasonable person could accept as adequate to support a conclusion. *Stubblefield v. Town of W. Yellowstone*, 2013 MT 78, ¶ 15, 369 Mont. 322, 298 P.3d 419. The record shows plainly that W.K.'s situation did not present as clear a case for commitment as the facts we reviewed in *In re S.H.*, *In re B.O.T.*, and *In re O.R.B*. Indeed, it likely could support a contrary conclusion. Though Ankelman acknowledged uncertainty about what might happen to W.K. were she left in the community untreated, the District Court relied on her unqualified opinion that W.K. was not "able to remain safe in the community." Ankelman's opinion was grounded in the evidence that W.K. lacked insight into her illness, did not have the "[]ability to make decisions" protective of her own health and safety, and was "unwilling to take any medication that will help her solve the manic symptoms" she was experiencing. Her attempts to care for herself, including making herself sick with excessive Pedialytes, reflected an inability to recognize the symptoms of her illness and impacted her judgment to the point where she refused medication and denied her bipolar diagnosis. W.K.'s testimony confirmed that her plan to take care of her own basic needs was simply to

11

continue with the sleep medications she already had and the sleep cycle directions her doctors had given her. A review of the record does not firmly convince us that the District Court made a mistake. On the whole, the evidence was sufficient to sustain its conclusion that W.K. was unable to provide for her basic health and safety needs.

## CONCLUSION

¶25 The District Court's involuntary commitment order is affirmed.


/S/ BETH BAKER


We concur:

/S/ MIKE McGRATH
/S/ JIM RICE
/S/ DIRK M. SANDEFUR


Justice Ingrid Gustafson, dissenting.

¶26 I dissent in the decision of the Court to uphold the District Court's order on the basis that it had sufficient evidence to support its finding that W.K. was substantially unable to provide for her own basic needs pursuant to § 53-21-126(1)(a), MCA. I would hold that the finding of the District Court that W.K. was substantially unable to care for her basic needs was clearly erroneous and reverse the District Court's order. Because the findings of the District Court were clearly erroneous, I do not consider the question whether sufficient evidence supported the District Court's decision. I believe the Court's holding affirms an expansive reach of involuntary commitment proceedings, which should not be condoned.

12

¶27 Although it could have been better laid out in her briefing, W.K. raises two distinct issues with the District Court's order. She challenges both the sufficiency of the evidence supporting the District Court's decision and, separately, whether its findings of fact were clearly erroneous. Thus, W.K. challenges both whether the State met its burden of proof—physical facts or evidence beyond a reasonable doubt and "all other matters" by clear and convincing evidence, *see* § 53-21-126(2), MCA—and, separately, whether the findings made by the District Court were clearly erroneous. These are two separate challenges with different standards of review. *See In re B.J.J.*, 2019 MT 129, ¶ 10, 396 Mont. 108, 443 P.3d 488. We will not substitute our judgment for that of the District Court as to the strength of the evidence when reviewing challenges to the sufficiency of the evidence, but as the Opinion states we "determine whether the conclusion that [the court] reach[ed] is supported by substantial evidence." Opinion, ¶ 24 (quoting *In re B.O.T.*, ¶ 21). We review findings of fact to determine whether they are clearly erroneous under a three part test: (1) we review the record to see if the findings are supported by substantial evidence; (2) if the findings are supported by substantial evidence the Court will determine if the trial court has misapprehended the effect of the evidence; and (3) if substantial evidence exists and the effect of the evidence has not been misapprehended, this Court may still conclude that a finding of fact is clearly erroneous when, although there is evidence to support it, a review of the record leaves this Court with the definite and firm conviction that a mistake has been made. *See In re G.M.*, 2008 MT 200, ¶¶ 22, 50, 344 Mont. 87, 186 P.3d 229 (holding that the district court misapprehended the effect of some evidence presented and that a mistake had been made with respect to other evidence presented); s*ee also Interstate Prod. Credit*

13

*Ass'n of Great Falls v. Desaye*, 250 Mont. 320, 323, 820 P.2d 1285, 1287 (1991) (adopting the three-part test).

¶28 In making its commitment determination, I believe the District Court was well-intentioned and desired to save this obviously high-functioning, competent, productive woman from having to endure several exacerbations of her newly presenting bipolar disorder before she fully accepted the new diagnosis, its attendant treatment, and its implications for her life in the future. While the District Court's commitment may very well have assisted W.K. in accepting her new mental health condition and obtaining more optimal treatment sooner, on appellate review this Court should not affirm such an expansive reach of involuntary commitment proceedings.

¶29 There is not substantial evidence to support the District Court's finding that W.K. was substantially unable to provide for her own basic needs of food, clothing, shelter, health, or safety as required under § 53-21-126(1)(a), MCA. The lack of sufficient evidence to support commitment under these particular facts is made clear by the fact that Lynelli Ankelman, LCPC, the State's expert, twice stated at the commitment hearing, "I don't think that there is enough information at this point in time to indicate [whether W.K. can meet her own basic needs.]" When asked whether W.K. could make good decisions for caring for herself, Ankelman later responded, "I would say at this point in her current state that she cannot." But Ankelman based that statement on (1) W.K.'s multiple trips to the E.R. and (2) the Pedialyte incident. The District Court could not rely on Ankelman's conclusions that W.K. could not care for herself because the reasons she provided as the basis for her conclusions could not independently support such a finding.

14

¶30 Seeking medical care at the E.R., even on multiple occasions, is not uncommon for individuals who do not feel well. W.K.'s trips to the E.R. indicated sound judgment in response to her feeling ill—she sought professional medical attention. Although perhaps unusual to drink more than one Pedialyte, it was not dangerous behavior and Ankelman did confirm that W.K. drank the Pedialyte to "stabilize" her salt and potassium levels. Further, the record and hearing testimony was, at best, murky with regard to the Pedialyte incident—it's unclear how many she drank, how "sick" she became, or whether this was something she did while with her family. In the light most favorable to the State, seeking frequent medical care over an approximate 10 day period, having reluctance to take potentially beneficial medications because of explained side-effects, and consuming Pedialyte to the point of illness does not constitute substantial evidence upon which to base a finding that W.K. was substantially unable to care for her own basic needs.

¶31 Ankelman also testified that, "for me the bottom line becomes, is she able to remain safe in the community. And the answer is no for me." Rather, than considering Ankelman's foundation for this statement to determine if it was misapprehended by the District Court, the Opinion, in essence, concludes that merely since she stated this conclusion, there was substantial evidence supporting commitment under § 52-21-126(1)(a), MCA. This testimony, however, does not inform determination under § 53-21-126(1)(a), MCA, but rather under § 53-21-126(1)(c) or (d), MCA, which the parties agree—and this Court clarifies in the Opinion—are not grounds for W.K.'s involuntary commitment. But more importantly, other than W.K.'s trips to the E.R. and the Pedialyte incident, the only other evidence in the record to support the District Court's

order was Ankelman's concern that if W.K. went on her planned trip to the Elton John concert in Las Vegas, she "would place herself in a potentially dangerous situation," because "someone could kidnap her. Someone could assault her . . . the possibilities are endless." This is wildly speculative and absurdly unlikely[1] and certainly does not constitute substantial evidence upon which to base an involuntary commitment under § 53-21-126(1)(a), MCA. Further, evidencing her ability to care for her own needs and safety, W.K. herself testified that she did not plan to go to the Elton John concert in Las Vegas. I would not only conclude the court lacked substantial evidence to support its finding that W.K. was substantially unable to provide for her own basic needs, I would also conclude the court misapprehended the evidence that was presented such that its finding was clearly erroneous.

¶32     Apparently as support for affirming the District Court here, the Opinion references *In re S.H.*, 2016 MT 137, 383 Mont. 497, 374 P.3d 693, *In re B.O.T.*, 2015 MT 40, 378 Mont. 198, 342 P.3d 981, and *In re Mental Health of O.R.B.*, 2008 MT 301, 345 Mont. 516, 191 P.3d 482, cases in which we recently affirmed a district court's decision to commit an individual under § 53-21-126(1)(a), MCA. But, as acknowledged in the Opinion, when compared with W.K., the respondents in *In re S.H.*, *In re B.O.T.*, and *In re Mental Health of O.R.B.* present clearer cases for commitment. S.H. sought help from the E.R., complaining of food poisoning, there were snakes in her stomach, black bugs in the toilet,

---

[1] A Google search for "kidnapping at Elton John concert" produces zero results of such ever happening calling into question whether Ankelman's assertion that W.K. desiring to attend a planned Elton John concert is evidence of her inability to provide for her own safety.

and the voices of God and Satan were arguing in her head. *In re S.H.*, ¶ 3. She was found to have history of a bipolar disorder, presenting in a manic state with auditory hallucinations. *In re S.H.*, ¶ 4. Her mood was unstable, and her thoughts disorganized. While at the clinic, she called 911 several times reporting false allegations of clinic staff physically and sexually abusing other patients. *In re S.H.*, ¶ 4. On the evening before her commitment hearing, she was engaged in a physical altercation with another patient. *In re S.H.*, ¶ 5. She was unable to articulate a clear plan of where she would go if released. She was not welcome at local shelters, was (prior to presenting to the E.R.) living in her van, and desired to continue to do so despite the weather recently turning very cold. *In re S.H.*, ¶ 5. While she was meeting her basic needs, clinic staff testified that based on her prior and continuing delusional thinking and physically aggressive behavior, she may be at risk of harming someone else. *In re S.H.*, ¶ 5.

¶33 *In re B.O.T.* and *In re O.R.B.* involved individuals who were substantially unable to provide for their own health—the implied grounds for committing W.K. here, as she had food, shelter, and clothing. In these cases, the respondents were demonstrably unable to provide for their own health *over extended periods of time.* Far different than the situation here, B.O.T. was initially taken into care as he was lying on the ground at the Missoula bus station on a cold, sleeting night. *In re B.O.T.*, ¶ 3. He was uncooperative with extremely disorganized thinking and mumbled speech. *In re B.O.T.*, ¶ 4. It was learned he had a history of mental health issues, was previously found disabled by the SSA and had a protective payee for his benefits, had been residing at several group homes but could no longer do that due to inappropriate sexual behaviors, and had been deteriorating over time.

17

*In re B.O.T.*, ¶¶ 6-8. He had recently been unable or unwilling to activate his food stamp card and was experiencing delusions. *In re B.O.T.*, ¶ 7. Finally, his mental health had interfered with treatment of his chronic diabetes, hypertension, and hyperkalemia. *In re B.O.T.*, ¶ 3. He had no family or friend support system. O.R.B.'s situation was likewise dramatically different than that of W.K. O.R.B. was diagnosed with schizophrenia and suicidal ideations, appeared delusional, and often had audio hallucinations. *In re Mental Health of O.R.B.*, ¶ 7. Commitment was sought a couple months after she broke her ankle and then did not take proper care of her leg—neglecting it to the point it could become life-threatening—was malnourished and had decaying teeth. *In re Mental Health of O.R.B.*, ¶¶ 7-11. She, too, had no family or support system.

¶34 Here, in stark contrast to S.H., B.O.T., and O.R.B., there is no evidence whatsoever that prior to the 10 days immediately preceding the commitment petition, W.K. had any symptoms of a mental health disorder and no evidence of any behaviors showing any deficiency in providing for her own basic needs of food, clothing, shelter, health, or safety. She had a home, food, and clothing; a prospering business; no chronic health conditions; had exhibited no physically aggressive behaviors; and had a strong family support system. The reality is that W.K. was committed, not based on substantial evidence of her inability to provide for her health needs, but rather on her family's concern and the desire to protect her from experiencing increased difficulties and future repeated decompensations, which could potentially occur given her newly diagnosed bipolar condition. While such motivation is understandable, it does not comply with governing involuntary commitment

18

statutes and creates potential for misuse of preemptive protection without full consideration of its calamitous effects.

¶35   We have previously recognized Montana's statutes governing involuntary commitment "are critically important due to the 'calamitous effect of a commitment,' which includes loss of liberty and damage to the respondent's reputation.  Therefore, the statutes are to be strictly followed." *In re Mental Health of C.R.C.*, 2004 MT 389, ¶ 13, 325 Mont. 133, 104 P.3d 1065 (citation omitted).   In light of this Court's clear pronouncement of the critical importance of strictly following Montana's statutes governing involuntary commitment and the complete lack of evidence indicating W.K. was substantially unable to provide for her own basic health needs pursuant to § 53-21-126(1)(a), MCA, no matter how well-intentioned, I would reverse the District Court's involuntary commitment of W.K.  We should not dilute our strict application of Montana's involuntary commitment statutes, as the majority does here, as future appellate review may not involve as well of intentioned decision-making as the District Court employed here.

/S/ INGRID GUSTAFSON

Justice Laurie McKinnon and Justice James Jeremiah Shea join in the dissenting Opinion of Justice Gustafson.

/S/ LAURIE McKINNON
/S/ JAMES JEREMIAH SHEA