FILED

June 7 2016

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 14-0777

DA 14-0777

IN THE SUPREME COURT OF THE STATE OF MONTANA

2016 MT 137

IN THE MATTER OF:

S.H.,

        Respondent and Appellant.

APPEAL FROM:     District Court of the Thirteenth Judicial District,
In and For the County of Yellowstone, Cause No. DI 14-0090
Honorable Ingrid Gustafson, Presiding Judge

COUNSEL OF RECORD:

        For Appellant:

            Chad Wright, Chief Appellate Defender, James Reavis, Assistant
Appellate Defender, Helena, Montana

        For Appellee:

            Timothy C. Fox, Montana Attorney General, Mardell Ployhar, Assistant
Attorney General, Helena, Montana

            Scott D. Twito, Yellowstone County Attorney, Ryan Nordlund, Deputy
County Attorney, Billings, Montana

            Submitted on Briefs:  April 13, 2016

            Decided:  June 7, 2016

Filed:

_____
Clerk

Justice Laurie McKinnon delivered the Opinion of the Court.

¶1     S.H. appeals from an order entered by the Thirteenth Judicial District Court, Yellowstone County, committing her to the Montana State Hospital for a period not to exceed three months.  We affirm.

¶2     S.H. presents the following issues for review:

1.     *Did the District Court rely on sufficient evidence to determine S.H. required commitment because she was either unable to care for her basic needs or was a threat to others?*

2.     *Did S.H. receive ineffective assistance of counsel?*

## FACTUAL AND PROCEDURAL BACKGROUND

¶3     On November 9, 2014, S.H. sought help from the emergency department at the Billings Clinic.  S.H. complained she was suffering from food poisoning, that there were snakes in her stomach, black bugs in the toilet, and the voices of God and Satan were arguing in her head.  Dr. Mark Nicholson (Dr. Nicholson), a psychiatrist at the Billings Clinic examined S.H. and, upon his recommendation, the State filed a petition to involuntarily commit S.H. on November 12, 2014.  The petition notified S.H. of her rights—including her "right to refuse any but lifesaving medication for up to 24 hours prior to any hearing held pursuant to [§ 53-21-115(11), MCA]."  The District Court ordered S.H. detained at the Billings Clinic pending resolution of the petition.  The District Court appointed counsel to represent S.H., held an initial hearing, and appointed Dr. Nicholson as the professional person to evaluate S.H.

2

¶4    Diane Goedde (Goedde), a nurse practitioner at the Billings Clinic, evaluated S.H. and filed a report with the District Court. Goedde's report explained that S.H. arrived at the Billings Clinic complaining that she had been poisoned, there was a snake in her stomach, a black bug in her toilet, and she was having auditory hallucinations. Goedde's report indicated S.H. has a history of bipolar disorder and was manic when she entered the Billings Clinic. S.H. received antipsychotic medications initially, but later refused to take them because she believed she had been healed. Goedde described S.H.'s mood as labile, or unstable, and her thoughts as disorganized. She reported that S.H. was verbally attacking staff, interfering with the care of other patients, and being very loud. S.H. called 911 several times to report, falsely, that the Billings Clinic staff were physically and sexually abusing other patients. Goedde stated S.H. could not convey a coherent plan for what she would do upon discharge. S.H. told Goedde she would contact celebrity musicians and get a job.

¶5    At 9:00 a.m. on November 17, 2014, the District Court held a hearing on the petition to involuntarily commit S.H. Although she had been living in her van before coming to the Billings Clinic, Goedde testified that S.H. was meeting her basic needs, was not malnourished, and was taking care of her hygiene. Goedde testified that S.H. did not have a clear plan of where she would go if released from the Billings Clinic. Goedde testified that S.H. was not welcome at local shelters. S.H. told Goedde she could stay with a friend, Matt, but then said she would not stay with him and would prefer to continue living in her van. Goedde questioned whether Matt knew "what he was getting into" by offering to let S.H. stay. Goedde testified she was concerned that staying in her

3

van was not a good choice for S.H. because the weather had recently turned very cold. Goedde testified that, on the evening before the commitment hearing, while she was not present, S.H. was engaged in a physical altercation with another Billings Clinic patient. Goedde testified that S.H. "may be at risk of harming someone else." Goedde testified that she was primarily concerned about S.H.'s lack of ability to care for herself because of her poor judgment and also that "she may get into other altercations with other people and end up being physically harmed." Goedde testified that S.H. refused to take medication, a method of treating her mental disorder, because she believes God healed her. Goedde testified that Billings Clinic staff involuntarily medicated S.H. after her physical altercation the previous night. Goedde stated, "over the past four days, she has not taken any medications, other than what we made her take because of the altercation."

¶6 S.H. testified that she received Supplemental Security Income and also worked through Advanced Employment as both a housekeeper at hotels and parking cars at Yellowstone Medical Center. S.H. testified that she only went to the emergency room to get treated for food poisoning. She explained, "I don't know what I was poisoned with at Denny's restaurant downtown, North 27th Street, by a bunch of felons that worked there, and I believe they were getting paid by the cops . . . as secret informants or whatever." S.H. continued that she was not treated for food poisoning. She thought she had food poisoning because her cousin told her that food poisoning is caused by parasites and she saw a bug in her toilet. In S.H.'s testimony, she tried to describe the reason for her physical altercation the prior night. She said, "I was molested by another female patient named Samantha, and they would not give me her name . . . . And she hugged me like a

4

sicko molester lesbian, and I screamed for help and I pushed her away, and then she tried to take me down . . . ." S.H. testified that she could stay with Matt in an emergency. When asked whether Matt had helped her in the past, S.H. responded:

> Yes. He -- I owe him thousands of dollars, because last time they had me locked up in a group home, and he has been locked up in jail, he knows how the devil works. It's just devil schemes, you know.
> But that's why I requested the President Obama -- that President Obama be called at my hearing before with Todd Baugh . . . .

S.H. testified that she did not need psychotic medication because she believes it makes people obese.

¶7 The District Court found that the State proved to a reasonable medical certainty that S.H. suffers from the mental disorder of bipolar disorder and that S.H. "is in a manic state, delusional, agitated and paranoid." The District Court also found that the State proved beyond a reasonable doubt that S.H. needs to be committed under § 53-21-126(1)(a) and (c), MCA, because "[s]he is an imminent threat to others and substantially unable to care for her basic needs because of her mental disorder." The District Court ordered S.H. committed to the Montana State Hospital for a period not to exceed three months. S.H. appeals. On December 16, 2014, the professional person for S.H. filed a notice of pending discharge unconditionally terminating S.H.'s commitment and setting a discharge date of December 19, 2014.

## STANDARDS OF REVIEW

¶8 We review a civil commitment order to determine whether its findings of fact are clearly erroneous and its conclusions of law are correct. *In re Mental Health of L.K.-S.*, 2011 MT 21, ¶ 14, 359 Mont. 191, 247 P.3d 1100 (citation omitted). A finding of fact is

5

clearly erroneous if it is not supported by substantial evidence, if the district court misapprehended the effect of the evidence, or if, after reviewing the record, we are left with the definite and firm conviction that a mistake was made. *L.K.-S.*, ¶ 14 (citation omitted).

¶9    An appeal from an order of involuntary commitment is not moot despite the respondent's release because the issues are capable of repetition and yet would otherwise evade review. *In re R.F.*, 2013 MT 59, ¶ 18, 369 Mont. 236, 296 P.3d 1189 (citations omitted).

## DISCUSSION

¶10    *1. Did the District Court rely on sufficient evidence to determine S.H. required commitment because she was either unable to care for her basic needs or was a threat to others?*

¶11    Before a district court may involuntarily commit a respondent, it must first determine he or she suffers from a mental disorder. Section 53-21-126(1), MCA. S.H. does not contest the District Court's finding that she suffers from a mental disorder.

> If the court determines that the respondent is suffering from a mental disorder, the court shall then determine whether the respondent requires commitment.    In    determining    whether    the    respondent    requires commitment . . . the court shall consider the following:
>
>         (a) whether the respondent, because of a mental disorder, is substantially unable to provide for the respondent's own basic needs of food, clothing, shelter, health, or safety;
>         (b) whether the respondent has recently, because of a mental disorder and through an act or an omission, caused self-injury or injury to others;
>         (c) whether, because of a mental disorder, there is an imminent threat of injury to the respondent or to others because of the respondent's acts or omissions; and

6

(d) whether the respondent's mental disorder, as demonstrated by the respondent's recent acts or omissions, will, if untreated, predictably result in deterioration of the respondent's mental condition to the point at which the respondent will become a danger to self or to others or will be unable to provide for the respondent's own basic needs of food, clothing, shelter, health, or safety. Predictability may be established by the respondent's relevant medical history.

Section 53-21-126(1), MCA. The District Court found S.H. required commitment because she was both substantially unable to provide for her own basic needs, under § 53-21-126(1)(a), MCA, and posed an imminent threat of injury to others, under § 53-21-126(1)(c), MCA. S.H. disputes whether the District Court relied on sufficient evidence to find she required commitment under either of these two subsections.

**Section 53-21-126(1)(a), MCA.**

¶12    In *In re S.M.*, 2014 MT 309, 377 Mont. 133, 339 P.3d 23, S.M. challenged whether sufficient evidence supported the district court's conclusion that she required commitment. There, the district court found S.M. required commitment under § 53-21-126(1)(a), MCA, because she was "unable to provide for her own basic needs, most particularly her health and safety." *S.M.*, ¶ 7. Evidence in the record indicated S.M. could not care for her health because she was refusing treatment and medication for her bipolar disorder, which led her condition to deteriorate. *S.M.*, ¶ 20. Additionally, evidence showed S.M. ran away from her mother because she believed her mother was stalking her, wandered onto strangers' properties, inappropriately removed her clothes and touched others, and believed others were changing her underwear in the night. *S.M.*, ¶ 20. This Court concluded the evidence was sufficient and affirmed the district court's

finding that S.M. required commitment under § 53-21-126(1)(a), MCA, because she was not able to care for her basic needs of health and safety. *S.M.*, ¶ 20.

¶13 Similar to *S.M.*, here, S.H. refused treatment and medication for her bipolar disorder and wished to continue living in her van. S.H. does not dispute the District Court's finding that she does, in fact, suffer from a mental disorder. S.H. refused treatment because she believed God healed her and medications because she believed they cause obesity. Similar to *S.M.*, S.H. exhibited her paranoia when, after finding a bug in her toilet, she believed felons working at Denny's restaurant poisoned her. Evidence showed the winter weather in Billings was inclement and S.H. wanted to continue living in her van. S.H. was not welcome at local shelters and could not describe whether she was willing or able to stay with her friend Matt. While refusing to take medication should not be the only basis for an order of involuntary commitment, here, evidence showed the District Court that S.H.'s refusal to obtain treatment, coupled with her paranoia, resulted in a lack of winter shelter. We conclude that the District Court relied on sufficient evidence—S.H.'s refusal to obtain treatment and her apparent lack of winter shelter—to find she required commitment under § 53-21-126(1)(a), MCA, because she was substantially unable to care for her basic needs.

**Section 53-21-126(1)(c), MCA.**

¶14 "Imminent threat of self-inflicted injury or injury to others must be proved by overt acts or omissions, sufficiently recent in time as to be material and relevant as to the respondent's present condition." Section 53-21-126(2), MCA. "Imminent threat does not mean that a person may possibly cause an injury at some time in the distant or

8

uncertain future. The danger must be fairly immediate. At the same time, the law does not require proof beyond a reasonable doubt that an injury will occur in the future. Threat is not certainty." *In re Mental Health of A.S.B.*, 2008 MT 82, ¶ 27, 342 Mont. 169, 180 P.3d 625, quoting *Matter of F.B.*, 189 Mont. 229, 233, 615 P.2d 867, 869 (1980). In *A.S.B.*, this Court affirmed the district court's finding that A.S.B. required commitment under § 53-21-126(1)(c), MCA. *A.S.B.*, ¶ 32. There, A.S.B. believed local police officers were conspiring against him and repeatedly placed himself in situations, by parking his vehicle near homes and businesses and living out of it, requiring the police to investigate him. *A.S.B.*, ¶¶ 7, 29. When investigated, A.S.B. acted aggressively, was intimidating, disrupted an investigation of an unrelated crime, and occasionally refused basic police requests, requiring an officer to draw his weapon. *A.S.B.*, ¶ 29. We concluded that this was substantial credible evidence supporting the district court's conclusion that A.S.B. posed an imminent threat of injury to himself under § 53-21-126(1)(c), MCA. *A.S.B.*, ¶ 29.

¶15 Here, S.H. was involved in a physical altercation with another Billings Clinic patient the night before her commitment hearing. S.H. testified that she pushed the patient away from her because the patient was a "sicko molester lesbian" who hugged her and then tried to take her down. This physical altercation provided the District Court with evidence of an overt act of S.H. that occurred the day before her hearing, sufficiently recent in time as to be material and relevant to her condition at the time. Although there was no evidence of injury, this act provided the District Court with evidence that S.H. poses an imminent risk of injury to others because of her delusions, agitation, and

9

paranoia. We conclude that the District Court relied on sufficient evidence to find S.H. required commitment under § 53-21-126(1)(c), MCA.

¶16    *2. Did S.H. receive ineffective assistance of counsel?*

¶17    Article II, Section 17, of the Montana Constitution and Title 53, Chapter 21, MCA, provide "an individual subject to an involuntary commitment proceeding the right to effective assistance of counsel, including the right to challenge a commitment order through a claim of ineffective assistance of counsel." *In re Mental Health of C.R.C.*, 2009 MT 125, ¶ 15, 350 Mont. 211, 207 P.3d 289 (citation omitted) (*C.R.C. II*). To measure effective assistance of counsel in involuntary commitment proceedings, we look to five critical areas including:  1) appointment of counsel; 2) counsel's initial investigation; 3) counsel's interview with the client; 4) the patient-respondent's right to remain silent; and 5) counsel's role as an advocate for the patient-respondent. *C.R.C. II*, ¶ 16 (citation omitted). The record is viewed as a whole and each factor is evaluated based upon the facts and circumstances of the entire case. *In re Mental Health of T.J.F.*, 2011 MT 28, ¶ 33, 359 Mont. 213, 248 P.3d 804 (citation omitted). The only factor implicated here is counsel's role as an advocate for the patient-respondent. In that regard, the proper role of the attorney is to "represent the perspective of the respondent and to serve as a vigorous advocate for the respondent's wishes." *C.R.C. II*, ¶ 18 (citation omitted). S.H. argues her Counsel was ineffective because she failed to object to testimony presented by someone other than the court appointed professional person and failed to ask for a continuance when she learned Billings Clinic staff involuntarily

10

medicated S.H. within 24 hours preceding her hearing. We address each contention in turn:

**Failure to object to testimony presented by someone other than the court appointed professional person.**

¶18 On November 14, 2014, the District Court appointed Dr. Nicholson to be S.H.'s professional person, evaluate her, and file a report with the Court. Instead, Goedde evaluated S.H. and filed a report with the Court. The Notice of Doctor's Report and the District Court's rder indicate that "Diane Goedde, FNP, a nurse practitioner with the Billings Clinic, filed her report with the court on behalf of Dr. Nicholson." Goedde testified that her report was based on her 10-15 minute daily meetings with S.H. from November 10 until November 14, 2014. S.H. argues Counsel was ineffective for not objecting to Goedde's report and testimony on the bases that Goedde was not the court appointed professional person and her evaluation did not satisfy § 53-21-123(1), MCA, because it was conducted, at least in part, prior to the Court ordering S.H. be evaluated.

¶19 S.H. relies upon § 53-21-123, MCA, and *In re C.R.C.*, 2004 MT 389, 325 Mont. 133, 104 P.3d 1065 (*C.R.C. I*), as support for her contention that Counsel rendered ineffective assistance. Section 53-21-123(1), MCA, provides:

> Following the initial hearing, whether before a judge or justice of the peace, the respondent must be examined by the professional person without unreasonable delay. The examination may not exceed a period of 4 hours. The professional person shall immediately notify the county attorney of the findings in person or by phone and shall make a written report of the examination to the court, with copies to the respondent's attorney and the county attorney.

11

Importantly, § 53-21-123(1), MCA, does not specify what constitutes an examination by a professional person except to require that it be conducted *following the initial hearing* and to limit it to a maximum of four hours. In *C.R.C. I*, ¶ 9, the district court appointed Dr. Mark Heppe, M.D. to evaluate C.R.C. and file a report, which he did not do. However, Eric Greenburg met with C.R.C. for twenty minutes on the morning of the hearing and, then during the hearing, the court appointed him as the professional person to evaluate C.R.C. *C.R.C. I*, ¶ 36. There, we concluded "Greenburg's testimony cannot be used to support the District Court's finding that C.R.C. required commitment." *C.R.C. I*, ¶ 36. Significantly, *C.R.C. I* did not address an ineffective assistance of counsel claim and Greenburg was not evaluating C.R.C. on Dr. Mark Heppe, M.D.'s behalf.

¶20 Here the District Court held an initial hearing on November 13, 2014, at 8:45 a.m. and Goedde filed her report on November 14, 2014, at 3:03 p.m. Goedde's report was based, at least in part, on meetings she had with S.H. after the initial hearing and, therefore, complied with § 53-21-123(1), MCA. S.H. does not contend Goedde was unqualified to act as a professional person and, based on the authority S.H. advances on appeal, the District Court's reliance on Goedde's report and testimony was not improper. Viewing the record as a whole, as we must, there are numerous indications that Counsel provided effective representation. On November 12, 2014, Counsel filed a notice of appearance on S.H.'s behalf. At the commitment hearing, Counsel capably cross-examined the witnesses. Counsel elicited testimony that revealed Goedde was not present during S.H.'s physical altercation, S.H. had an income and was capable of working, S.H. could stay with a friend in an emergency, and S.H. did not appear to be

12

malnourished and was hygienic. Counsel attempted to redirect S.H. when her testimony veered off-topic and asked several questions that could have helped S.H., but S.H. was incapable of answering them in a coherent manner. We conclude that the record as a whole demonstrates that Counsel vigorously represented S.H.'s wishes. *T.J.F.*, ¶ 33.

**Failure to ask for a continuance when Counsel learned Billings Clinic staff involuntarily medicated S.H. within 24 hours preceding her commitment hearing.**

¶21 Section 53-21-115(11), MCA, confers "the right to refuse any but lifesaving medication for up to 24 hours prior to any hearing held pursuant to this part." Billings Clinic staff involuntarily medicated S.H., by giving her an injection, the evening before her morning commitment hearing. The record does not indicate whether the injection was lifesaving or whether S.H. was still under its effects at the time of the hearing. Counsel did not learn about the involuntary medication until Goedde revealed it during her testimony. In light of the evidence that indicates Counsel's vigorous representation of S.H. and Counsel's lack of knowledge about S.H.'s involuntary medication until during the hearing, we cannot conclude that failing to ask for a continuance defeats Counsel's otherwise effective representation.

### CONCLUSION

¶22 We conclude sufficient evidence supported the District Court's conclusion that S.H. required commitment under both § 53-21-126(a) and (c), MCA, and Counsel did not render ineffective assistance. Affirmed.

/S/ LAURIE McKINNON

13

We Concur:

/S/ MIKE McGRATH
/S/ MICHAEL E WHEAT
/S/ JAMES JEREMIAH SHEA
/S/ JIM RICE