FILED

09/22/2020

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 19-0333

DA 19-0333

IN THE SUPREME COURT OF THE STATE OF MONTANA

2020 MT 241N

IN THE MATTER OF:

P.Y.,

        Respondent and Appellant.

APPEAL FROM:    District Court of the Thirteenth Judicial District,
In and For the County of Yellowstone, Cause No. DI 19-28
Honorable Gregory R. Todd, Presiding Judge

COUNSEL OF RECORD:

        For Appellant:

        Gregory D. Birdsong, Birdsong Law Office, Missoula, Montana

        For Appellee:

        Timothy C. Fox, Montana Attorney General, Tammy K Plubell, Assistant
Attorney General, Helena, Montana

        Scott D. Twito, Yellowstone County Attorney, Billings, Montana

Submitted on Briefs:  August 26, 2020

Decided:  September 22, 2020

Filed:

           _____
                     Clerk

Chief Justice Mike McGrath delivered the Opinion of the Court

¶1 Pursuant to Section I, Paragraph 3(c), Montana Supreme Court Internal Operating Rules, this case is decided by memorandum opinion and shall not be cited and does not serve as precedent. Its case title, cause number, and disposition shall be included in this Court's quarterly list of noncitable cases published in the Pacific Reporter and Montana Reports.

¶2 On April 5, 2019, nurse practitioner Bonnie Karinen (Karinen) at the Billings Clinic (Clinic) requested a petition to involuntarily commit P.Y. to the Montana State Hospital. In her Involuntary Emergency Hold Note, Karinen wrote that P.Y. had been brought to the clinic by law enforcement after he had reportedly thrown a brick through the window of the home of a person P.Y. believed to be a famous psychic from California who was "violating" his thoughts and attempting to control P.Y.'s mind. P.Y. had apparently told the individual that he needed to leave the community. Karinen's note attributed this course of behavior to P.Y.'s schizoaffective disorder, for which he had stopped taking medications two months prior, and recommended involuntary commitment and involuntary administration of medication.

¶3 On April 8, 2019, the Yellowstone County Attorney's office (State) filed a petition for involuntary commitment in Montana's Thirteenth Judicial District Court. The District Court appointed Karinen as the statutorily-defined "professional person" to examine P.Y. On April 10, 2019, the State submitted Karinen's written report. Karinen's report described P.Y. as suffering from schizoaffective disorder with impaired insight and

judgment as well as symptoms of paranoia and delusional thinking. In her report, Karinen recommended involuntary commitment and involuntary administration of medication.

¶4 On April 11, 2019, the District Court held an evidentiary hearing. Karinen testified for the State that P.Y. suffered from schizoaffective disorder and experienced delusions that someone in his community was a famous psychic from California who was manipulating his thoughts. Karinen further related that P.Y. had told the person to leave town, had urged others to convey the same message, and had eventually thrown a brick through the person's window. Karinen testified that P.Y. had told her that he threw the brick to "send [the person] a message" that he was serious about the individual leaving town, though he did not intend to hurt anyone.

¶5 Further, P.Y. had refused medication while at the Clinic because he denied having schizoaffective disorder. Karinen stated that, while P.Y was generally able to care for himself, he had declined medication for his high blood pressure and diabetes and she believed his schizoaffective disorder was interfering with his ability to provide himself with medical care.

¶6 Karinen testified that, according to records obtained from P.Y.'s primary care provider, P.Y. had gone off his medication previously, in 2017, resulting in auditory hallucinations and possible mania. Karinen concluded that without medication P.Y.'s condition would not improve and "he could decompensate and actually get worse."

¶7 P.Y. testified on his own behalf. He denied having schizoaffective disorder and stated that he had been prescribed an antipsychotic in the past merely as a sleep aid after Lunesta failed to relieve his insomnia. He testified that the antipsychotics had put him in

3

a "psychotic depression" and subsequent attempts to counter this effect with an antidepressant had made him "too manic." P.Y. testified that he was "really sensitive to mania" and had stopped taking medication because "ultimately . . . it didn't work."

¶8 P.Y. also testified that he had discontinued his hypertension medication because "it took away [his] energy." He denied having any symptoms of hypertension or diabetes and maintained that he felt quite healthy. P.Y. said that he had refused diabetes medications at the Clinic because he objected to them "being forced on me here in . . . a locked ward" and testified that, as "the authority over [his] own body," he would initiate treatment on his own.

¶9 P.Y. denied that the decision to throw a rock through a window was caused by a mental disorder, stating that he intended to take full responsibility for his actions, including by paying restitution for the window, through the criminal justice system. P.Y. described the issue as "[a]bsolutely resolved" and assured the court that there would be no further acts of violence.

¶10 On cross examination, the State pressed P.Y. on why he had thrown a projectile through the window of a community member. P.Y. confirmed believing that the individual was a psychic but denied having said that the person had been controlling his mind. P.Y. testified that he had gone "door to door" to speak with neighbors about his suspicions regarding this individual and had concluded that the individual was a "malicious, nefarious character in our community." P.Y. declined to address the matter further, which he viewed as "paranormal kind of spinoff" from the "core issue" that the individual had been harassing him in the community by "interfering with [his] privacy." P.Y. did not respond

4

to repeated questions of how the individual had violated his privacy, declaring it "a nonissue."

¶11 While reading a prepared statement, P.Y. described himself as an international essayist, poet, and story writer who was "[r]eality-oriented, 100 percent." He also related his suspicions that neighbors were stealing items—such as t-shirts, a can opener, and bread—from his apartment and were "harass[ing]" him at the store. P.Y. described being shot at by a group of men hiding in the trees while he was walking near Glacier National Park. He testified that he had responded by "ke[eping] an even keel" during the incident, crouching down, and shouting "[h]ey, there is a pedestrian here," before continuing his walk amidst ongoing gunfire and ultimately having "a really great day."

¶12 At the close of the hearing, the District Court found that P.Y. suffered from a mental disorder, was a danger to others, and could not take care of himself. The District Court ordered involuntary commitment and administration of medication in the Montana State Hospital for up to 90 days.

¶13 The District Court issued a written involuntary commitment order with findings of fact and conclusions of law. The District Court referenced Karinen's written report:

> Karinen found that [P.Y.] suffers from a mental disorder. He suffers from a schizoaffective disorder. He needs to be committed because he is a threat to others. He is delusional with impaired judgment. He has threatened to harm his neighbor. The least restrictive treatment option that would provide him with adequate treatment would be a commitment to the Montana State Hospital. He needs constant supervision to ensure he does not harm others.

¶14 The District Court found that P.Y. had not complied with treatment, continued to be delusional, and could not safely be discharged. The Court indicated that schizoaffective

5

disorder "seem[s] to impair [P.Y.'s] ability to make an informed decision to forego treatment for his diabetes and hypertension." The District Court concluded that the State had proved beyond a reasonable doubt that P.Y. needed to be committed because of a mental disorder which caused him to be a threat to others and unable to care for himself. This appeal followed.

¶15 On appeal, P.Y. argues that the State failed to put forth sufficient evidence that he was a threat to others or unable to care for himself. He also argues that Karinen's testimony and written report contained inadmissible hearsay and was not supported by other sources of evidence as required by statute.

¶16 When reviewing civil commitment orders, we determine whether the lower court's findings of fact are clearly erroneous and whether the conclusions of law are correct. *In re S.H.*, 2016 MT 137, ¶ 8, 383 Mont. 497, 374 P.3d 693. However, we do not substitute our judgment for that of the lower court as to the strength of the evidence. *In re B.J.J.*, 2019 MT 129, ¶ 10, 396 Mont. 108, 443 P.3d 488. When reviewing the lower court's determination of the sufficiency of the evidence for a civil commitment case, we view the evidence in the light most favorable to the prevailing party. *In re C.R.C.*, 2004 MT 389, ¶ 11, 325 Mont. 133, 104 P.3d 1065. We review matters of statutory interpretation de novo. *City of Missoula v. Iosefo*, 2014 MT 209, ¶ 8, 376 Mont. 161, 330 P.3d 1180. Plain error review is invoked sparingly and is discretionary. *In re C.B.*, 2017 MT 83, ¶ 16, 387 Mont. 231, 392 P.3d 598.

¶17 To order an involuntary commitment, the district court must determine that the respondent is both suffering from a mental disorder and requires commitment. Section

6

53-21-126(1), MCA. To determine whether an individual requires commitment, the court must consider multiple factors including whether the individual's mental disorder created "an imminent threat of injury to the respondent or to others" or caused—or predictably would cause—the person to be unable to provide for his or her "own basic needs of food, clothing, shelter, health, or safety." Section 53-21-126(1), MCA.

¶18 In addition, the statute provides that the court-appointed "professional person" may "testify as to the ultimate issue of whether the respondent is suffering from a mental disorder" but such testimony "is insufficient unless accompanied by evidence from the professional person or others" supporting any of the above-described considerations. Section 53-21-126(4), MCA. The State must prove physical facts or evidence beyond a reasonable doubt and "all other matters" by clear and convincing evidence. Section 53-21-126(2), MCA.

¶19 P.Y. first argues that the District Court erred in concluding that the State had carried its burden of proving that P.Y.'s mental disorder caused an "imminent threat of injury" to others. P.Y. maintains that the District Court's factual findings and legal conclusions were unsupported by evidence in the record and derived from mischaracterizations of the available evidence.

¶20 Karinen's report noted that P.Y. believed a psychic from California was "violating his mind," had told the individual that he needed to leave the community, and threw a brick through the person's window. The report went on to detail that the individual continues to the be the subject of P.Y.'s "fixed delusions," which "could worsen and possibly lead to him harming this individual." Karinen's report also said that there was "no lesser

7

alternative" to commitment in the State Hospital, as P.Y. would "likely decompensate further" until medication was administered. The District Court's paraphrasing of Karinen's report here is not inaccurate to the point of giving rise to clearly erroneous findings of fact or incorrect legal conclusions.

¶21 There was sufficient evidence presented at the hearing in addition to Karinen's report to support the District Court's conclusion that P.Y. was a danger to others. Karinen testified that P.Y. believed an individual in town was a psychic and manipulating his thoughts, had confronted the individual and told him to leave the community, and had thrown a brick through a window to send "a message." Karinen testified that, in light of P.Y.'s past experience going off his medication, his condition might continue to deteriorate without intervention.

¶22 P.Y.'s own testimony also supported the District Court's determination. P.Y. testified that he had gone "door to door" inquiring about someone he believed to be a psychic and a "malicious, nefarious character in our community." He did not deny throwing a projectile through the person's window. Beyond alleging that the individual had been harassing him by "interfering with [his] privacy," P.Y. declined to explain—by going into a "paranormal kind of spinoff"—what had led him to take such action. Without a satisfactory explanation for P.Y.'s escalating unorthodox actions towards an individual P.Y. believed to be "nefarious," the District Court could well have concluded that P.Y.'s increasingly unique perception of reality could give rise to more acts of violence toward the targeted individual. Viewing this evidence in the light most favorable to the prevailing

8

party, we conclude that the District Court die not err in determining that P.Y. was a danger to others and required commitment and the administration of medications.

¶23 P.Y. also contests the District Court's conclusion that he was unable to care for himself by making informed decisions regarding treatment for diabetes or hypertension. Section 53-21-126(4), MCA, allows a court to order commitment when a professional person's testimony that an individual is suffering from a mental disorder and requires commitment is supported by evidence of any one of several factors, including the presence of an imminent threat to others and an inability to care for oneself. Because Karinen's testimony that P.Y was suffering from a mental disorder and required commitment was adequately supported by substantial evidence of a threat of injury to others under § 53-21-126(4)(c), MCA, we need not address whether the Court also properly concluded P.Y. was unable to provide for his own health under § 53-21-126(4)(a), MCA.

¶24 P.Y. argues that the unique nature of an involuntary commitment proceeding justifies a more liberal use of plain error review for evidence that was not objected to below. However, we cannot reach this issue because, even now on appeal, P.Y. does not make clear which statements he believes should have been excluded. P.Y. simply claims that, without supporting evidence from additional State witnesses, Karinen's testimony regarding P.Y.'s medical conditions and medication requirements is hearsay. P.Y. does not explain why any, let alone all, of Karinen's testimony and report is inadmissible hearsay, or how the absence of other State witnesses in this case is relevant to the hearsay question. Assertions of plain error must be raised and argued. *See, e.g., In re J.D.L.*, 2008 MT 445, ¶¶ 5, 9, 348 Mont. 1, 199 P.3d 805. Since P.Y. has identified no specific

9

statements as inadmissible, either below or on appeal, we cannot analyze them to determine whether the statements were hearsay not within an exception and whether they justify plain error review.

¶25 Finally, P.Y. misinterprets § 53-21-126(4), MCA, as requiring the State to put on additional evidence beyond Karinen's report and testimony. The statute makes clear that the professional person's opinion on the "ultimate issue"—the presence of a mental disorder and the necessity of commitment—does not relieve the State of its burden of providing evidence of a threat or other statutory factors supporting commitment. The provision explicitly allows for that evidence to be provided by the professional person herself. *See* § 53-21-126(4), MCA (requiring accompanying evidence "from the professional person or others"). The Court-appointed professional person here, Karinen, testified not only to the ultimate issue that P.Y. required commitment, but also satisfied the statutory requirement by providing significant amounts of evidence—supported by P.Y.'s own testimony—that P.Y. was a threat to others.

¶26 We have determined to decide this case pursuant to Section I, Paragraph 3(c) of our Internal Operating Rules, which provides for memorandum opinions. This appeal presents no constitutional issues, no issues of first impression, and does not establish new precedent or modify existing precedent.

¶27 Affirmed.

/S/ MIKE McGRATH

10

We Concur:

/S/ JAMES JEREMIAH SHEA
/S/ BETH BAKER
/S/ DIRK M. SANDEFUR
/S/ JIM RICE