

FILED

08/17/2021

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 19-0351

DA 19-0351

IN THE SUPREME COURT OF THE STATE OF MONTANA

2021 MT 209N

IN THE MATTER OF:

F.J.S.,

        Respondent and Appellant.

FILED

AUG 17 2021

Bowen Greenwood
Clerk of Supreme Court
State of Montana

APPEAL FROM:    District Court of the Twenty-First Judicial District,
In and For the County of Ravalli, Cause No. DI 19-11
Honorable Jennifer B. Lint, Presiding Judge

COUNSEL OF RECORD:

       For Appellant:

              Tracy Labin Rhodes, Labin Rhodes Law, PLLC, Missoula, Montana

       For Appellee:

              Austin Knudsen, Montana Attorney General, Brad Fjeldheim, Assistant Attorney General, Helena, Montana

              William E. Fulbright, Ravalli County Attorney, Hamilton, Montana

Submitted on Briefs:  May 19, 2021

Decided:  August 17, 2021

Filed:

                       _____
                               Clerk

Chief Justice Mike McGrath delivered the Opinion of the Court.

¶1 Pursuant to Section I, Paragraph 3(c), Montana Supreme Court Internal Operating Rules, this case is decided by memorandum opinion and shall not be cited and does not serve as precedent. Its case title, cause number, and disposition shall be included in this Court's quarterly list of noncitable cases published in the Pacific Reporter and Montana Reports.

¶2 F.J.S. appeals from an April 25, 2019 Montana Twenty-First Judicial District Court order committing F.J.S. to the Montana State Hospital for up to three months and authorizing the involuntary administration of medication. We affirm.

¶3 On April 22, 2019, the Ravalli County Attorney (State) filed a Petition for Commitment and Statement of Patient's Rights, alleging that F.J.S. had become a danger to himself or others because of a mental disorder. The Petition cited a recommendation by a certified mental health professional and licensed clinical professional counselor, Fred Huskey (Huskey). Prior to the commitment hearing, Huskey interviewed F.J.S., reviewed his mental health treatment history, conferred with F.J.S.'s local Program for Assertive Community Placement Team (PACT), and met with F.J.S.'s parents.

¶4 At the April 25, 2019 commitment hearing, Huskey testified that information from PACT members indicated that F.J.S. had been decompensating since the beginning of the month, engaging in erratic behaviors such as putting his head to a light bulb in an apparent effort to acquire more "brain energy" and having left his trailer over the weekend out of fear that people were trying to break in to rape or shoot him. Huskey diagnosed F.J.S. with

2

schizophrenia, paranoid type and social anxiety disorder, testifying that F.J.S. had been first diagnosed as early as age fifteen or sixteen. He also stated that F.J.S. had previously been hospitalized for a mental disorder in Texas and several times in Montana, most recently at Montana State Hospital (MSH) the previous summer. Huskey testified to hearing reports of poor living conditions at F.J.S.'s trailer, including a large amount of "debris and garbage around," unrefrigerated food, mouse feces, broken furniture, "trash really all over the place," and a heater in poor repair under the trailer that was believed to be a fire hazard. Huskey testified that there was a "good chance [F.J.S.] may be evicted, if he's not already evicted."

¶5 Huskey related that F.J.S. was not currently working, despite being a very talented artist, opining that F.J.S.'s art pursuits had been hindered by his mental illness. Huskey testified that F.J.S. had indicated he had been able to address his basic needs by going to a grocery store, an ATM machine, or calling his parents who live in Idaho. Huskey concluded, however, that F.J.S. was unable to care for his own basic needs at the time of the hearing.

¶6 Huskey testified as to his opinion that F.J.S. would continue to decompensate without treatment and that F.J.S. was in "a repetitive cycle where he does present well under care and then when he's left to himself he decompensates to where he cannot meet his own basic needs." Huskey testified that F.J.S. did not believe he suffered from a mental illness and opined that F.J.S.'s recent improvement seemed to stem from being urged to take his medication by staff at West House Crisis Center, where F.J.S. had recently been detained. Huskey believed that F.J.S.'s history showed "that after a brief period of time

3

that he will no longer take medications, and then that's when he starts deteriorating." Huskey recommended MSH commitment for up to 90 days, authorization for involuntary medication if necessary, and a group home setting upon release.

¶7 F.J.S. testified on his own behalf. He described receiving about $100 per week of disability income. He testified that he had previously received more than $200,000 for his artwork. F.J.S. related that he had agreements with two galleries where he could sell artwork he produced. F.J.S. testified that he was not being evicted, stating instead that he had received a warning regarding complaints about his music being too loud and that he was planning to move out soon, regardless. He related that he shopped for food at the Super 1 market in a nearby town. F.J.S. contested the assertion that his heater was a fire hazard, stating that the heater under his trailer was unplugged and carefully located. Additionally, he noted that, while he had attempted suicide once years before, he was "ready to start a life" and had "no intentions to kill myself whatsoever." F.J.S. testified that he had recently purchased a vehicle.

¶8 F.J.S. testified that he was prescribed a mild antipsychotic drug to take once a day but, due to unpleasant side-effects, had attempted going without for a couple days while seeking to determine "if there's something else [he] could try." He said he was "willing to work with the PACT team and take what they want" and "have them watch [him] take it," but that injectable medication was "a really bad option."

¶9 F.J.S.'s father, S.S., then testified, describing the condition of F.J.S.'s trailer:

> It was, I believe, inhabitable. There's no water. When we got him set up there—I don't remember the exact date—we got a used trailer, and it had the water going. I think everything was working, the stove. And as of now, the

4

fridge doesn't work. There's no water. He has a space heater, and the furniture is broken. I don't—From most standards, it would be—I love my son, but it would be a tough deal for anyone to live in this trailer. The PACT team members saw it.

So he couldn't cook in there, and there's spoiled food in there right now. There's mouse poop. It's moldy. I'm not sure if that's from a leak in the roof. There was some word that someone cut the water hose to his trailer. That's turned off.

Maybe you didn't realize it, but there was a heater tipped over, and it was plugged in. Maybe it was just a misunderstanding. Anyway, that could have been an accident.

¶10 S.S. stated that property management had notified S.S. of "so many complaints" by neighbors regarding the noise of music and "pounding"—which S.S. suspected to be the sound of F.J.S. destroying furniture with mallets—from F.J.S.'s trailer resulting in a three-day eviction notice from property management. S.S. had negotiated for "mercy and grace," but indicated that if "it happens again, I don't know what I'm going to tell [the property manager]." S.S. indicated that there was "no chance of renting a place in Montana" for F.J.S. because of a bad reference from a previous landlord claiming F.J.S. owed $20,000 in property damage.

¶11 S.S. said that he and his wife had been hoping F.J.S. "would be ready to have a vehicle, and we brought it down, and that didn't go real well. We have it in the repair right now." S.S. testified that art galleries would be glad to take F.J.S.'s artwork but that F.J.S. had produced none recently. S.S. believed that F.J.S. could not currently meet his own basic needs based on his "experience over the last three years. We've gave and tried to provide every opportunity to make it work for him, and it's come to an eviction notice and an inhabitable trailer." S.S. testified that he would prefer that F.J.S. go to a group home

5

with support, rather than to involuntary commitment, but did not oppose involuntary commitment at MSH "if it helps to stabilize and get him to the next level or to the next best thing."

¶12 The District Court, noting that this case was less clear than most, signed the commitment order and authorization for involuntary administration of medication, stating: "I am gravely concerned of putting you back in an environment that's clearly unhealthy. I appreciate that you are not happy with your medications. Unfortunately, your last reaction to not being happy with them was to stop taking them." The court went on: "This is not the first time where we've had someone in your circumstance where I wish we had something in between. I wish we had something that wasn't West House [Crisis Center] but wasn't the state hospital."

¶13 F.J.S. appeals the commitment order—alleging insufficiency of the evidence—and the authorization for involuntary administration of medication.

¶14 The parties contest the appropriate standard of review. We have reviewed civil commitment orders to determine whether the district court's findings of fact are clearly erroneous and whether its conclusions of law are correct. *See, e.g., In re S.H.*, 2016 MT 137, ¶ 8, 383 Mont. 497, 374 P.3d 693. A finding of fact is clearly erroneous if it is not supported by substantial evidence, if the district court misapprehended the effect of the evidence, or if, after reviewing the record, this Court is left with the definite and firm conviction that the district court made a mistake. *In re S.H.*, ¶ 8. However, F.J.S. argues that, because physical facts in Montana civil commitment proceedings must be proven beyond a reasonable doubt pursuant to § 53-21-126(2), MCA, the "clearly erroneous"

6

standard of review this Court usually employs when reviewing factual findings in civil matters is inappropriate when reviewing a sufficiency of the evidence challenge to an involuntary commitment order on appeal. Instead, F.J.S. points us to *In re D.M.S.* where we analogized the standard of review for a sufficiency of the evidence challenge to a civil commitment proceeding to that of a criminal trial: asking whether "after reviewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found" the essential statutory elements "beyond a reasonable doubt." *In re D.M.S.*, 2009 MT 41, ¶ 11, 349 Mont. 257, 203 P.3d 776.

¶15 Irrespective of the standard, it is clear the court determined the testimony from F.J.S.'s father and Huskey to be more credible as to the basic facts. And, although the court noted it was a close call, it found that F.J.S. was unable to care for himself based on those facts.

¶16 In a civil commitment proceeding, the district court must first determine whether the respondent suffers from a mental disorder. Section 53-21-126(1), MCA. If the court finds in the affirmative, the court will then determine whether the respondent requires commitment. Section 53-21-126(1), MCA. To determine whether the respondent requires commitment, the court must consider:

> (a) whether the respondent, because of a mental disorder, is substantially unable to provide for the respondent's own basic needs of food, clothing, shelter, health, or safety;
> (b) whether the respondent has recently, because of a mental disorder and through an act or an omission, caused self-injury or injury to others;
> (c) whether, because of a mental disorder, there is an imminent threat of injury to the respondent or to others because of the respondent's acts or omissions; and

(d) whether the respondent's mental disorder, as demonstrated by the respondent's recent acts or omissions, will, if untreated, predictably result in deterioration of the respondent's mental condition to the point at which the respondent will become a danger to self or to others or will be unable to provide for the respondent's own basic needs of food clothing, shelter, health, or safety. Predictability may be established by the respondent's relevant medical history.

Section 53-21-126(1), MCA.

¶17 F.J.S. does not challenge the District Court's finding that he suffered from a mental disorder as defined by § 53-21-126(1), MCA. Rather, he argues that the District Court's finding that he required commitment was based on insufficient evidence or incorrect findings of fact. The parties agree that the relevant statutory considerations that could have supported the District Court's determination in F.J.S.'s case are subsections (a) and (d): whether F.J.S. was currently "unable to provide for [his] own basic needs of food, clothing, shelter, health, or safety" or whether F.J.S. would "predictably . . . deteriorat[e]" to that point.

¶18 F.J.S. first challenges the sufficiency of the evidence under § 53-21-126(1)(a), MCA: whether, at the time of the commitment hearing, F.J.S. was "substantially unable to provide for the respondent's own basic needs of food, clothing, shelter, health, or safety" because of a mental disorder. F.J.S. takes issue with several of the District Court's factual findings supporting its disposition. F.J.S. first contends that the District Court's finding that "[t]here was no running water [in F.J.S.'s trailer], and the heater was in serious need of repair, constituting a hazard to his safety" was not supported by evidence sufficient to establish these facts beyond a reasonable doubt. However, F.J.S. himself did not dispute

8

the basic points as to the condition of his home and the eviction notice itself. The State presented sufficient evidence.

¶19 Furthermore, F.J.S. admitted that he had stopped taking his medication, and Huskey testified to concerns of an ongoing pattern of going off medication followed by periods of decompensation, as well as increasingly erratic behavior by F.J.S. There was sufficient evidence by which a rational trier of fact could have concluded that the State had proven, beyond a reasonable doubt, that F.J.S. was "substantially unable to provide for the respondent's own basic needs of food, clothing, shelter, health, or safety," pursuant to § 53-21-126(1)(a), MCA.

¶20 F.J.S. also argues that the District Court failed to make the required factual findings as required by § 53-21-127(8), MCA:

> In ordering commitment pursuant to this section, the court shall make the following findings of fact:
>
> . . .
>
>     (b) the alternatives for treatment that were considered;
>     (c) the alternatives available for treatment of the respondent;
>     (d) the reason that any treatment alternatives were determined to be unsuitable for the respondent . . . .
>     (f) if the order includes a requirement for inpatient treatment, the reason inpatient treatment was chosen from among other alternatives.

¶21 The District Court's commitment order found that:

> Of the treatment alternatives available and investigated by the Professional Person, commitment to the Montana State Hospital offers the least-restrictive environment for the needs of the Respondent, and other possible alternatives, including out-patient treatment, are not suitable based upon the Respondent's behavior and non-compliance with medications.

9

¶22 F.J.S. contends that the court's findings failed to include specific consideration of less restrictive placement options or the rationale for dismissing them, as required by § 53-21-127(8), MCA.

¶23 The District Court did make the necessary express findings of fact to comply with § 53-21-127(8), MCA. The District Court order explicitly concluded that "[o]f the treatment alternatives available ... *other possible alternatives* [to MSH], including out-patient treatment," were inappropriate. (Emphasis added.) The District Court judge further noted that she wished there was more suitable placement for F.J.S. The District Court order was based in part on the determination that such alternatives were not suitable for F.J.S. on the basis of F.J.S.'s "behavior and non-compliance with medications," meeting the requirement that the court provide "the reason that any treatment alternatives" were rejected and "inpatient treatment was chosen" pursuant to § 53-21-127(8)(d) and (f), MCA.

¶24 During the commitment hearing, F.J.S.'s counsel recommended "let[ting F.J.S.] go back into the community, do his thing with the PACT team to help him," despite also describing the current situation as due to "a failing of" PACT. Based on F.J.S.'s history and the inability of anyone at the hearing to suggest an acceptable less-restrictive alternative, we cannot say that the District Court erred in determining that there were no suitable alternatives to an MSH placement for F.J.S.

¶25 F.J.S.'s second major argument is that the court order authorizing the involuntary administration of medication did not satisfy statutory requirements. Section 53-21-127(6), MCA, provides that:

10

> The court may authorize the chief medical officer of a facility or a physician designated by the court to administer appropriate medication involuntarily if the court finds that involuntary medication *is necessary* to protect the respondent or the public or to facilitate effective treatment.

(Emphasis added.) If the order includes involuntary medication, "the reason involuntary medication was chosen from among other alternatives" must be included as a finding of fact. Section 53-21-127(8)(i), MCA.

¶26 The District Court found that "[i]nvoluntary medication was chosen among other options because [F.J.S.] refuses to take medications voluntarily and medications are necessary to treat [F.J.S.]'s mental disorder and to prevent deterioration of [F.J.S.]'s mental condition. [F.J.S.]'s mental disorder cannot be treated effectively without medications."

¶27 "Necessary" involuntary administration of medication requires both that the medication itself be necessary for effective treatment, as a medical matter, and that there is an indication that a patient is likely to refuse it, making its involuntary administration necessary as a practical matter. In *In re C.B.*, 2017 MT 83, ¶¶ 5, 43, 387 Mont. 231, 392 P.3d 598, the Court noted that a history of noncompliance with prescribed medication is sufficient to establish the latter.

¶28 The District Court heard evidence from both F.J.S.'s father and Huskey that F.J.S. had a cyclical history of going off medication and decompensating to the point where intervention was required. The District Court also found that F.J.S.'s mental disorder could not be treated without medication. The District Court did not err in determining that authorizing the involuntary administration of medication by MSH "is necessary" to treat F.J.S. and prevent further deterioration.

11

¶29 We have determined to decide this case pursuant to Section I, Paragraph 3(c) of our Internal Operating Rules, which provides for memorandum opinions. In the opinion of the Court, the case presents a question controlled by settled law or by the clear application of applicable standards of review.

¶30 Affirmed.

/s/ _____
Chief Justice

We Concur:

/s/ _____

/s/ _____

/s/ _____

/s/ _____
Justices